## Sun Oil Company *v.* Nunnery

No. 43212 December 14, 1964 170 So. 2d 24

*Edwin M. Cage,* Dallas, Texas; *Armstrong & Hoffman,* Hazlehurst, for appellant.

*McGehee, McGehee & Torrey,* Meadville, for appellee.

GILLESPIE, J.

■■■ ■ This appeal presents the novel question whether the lessee in an oil and gas lease is liable to the lessor for damages done by lessee to the surface of the lessor's land by clearing the location in preparation for drilling an oil well which was never drilled due to the influx of salt water in adjoining wells. We hold that a jury issue was made and affirm the judgment in favor of the lessor as to liability.

NORTH

SUN OIL COMPANY
Produced of Section 22 & 23, T1N
R-8E, Pike County, Mississippi
South Area Little Creek Field
Date: ___ By: Tillman No. 1

SCALE 1" = 200'

J.W. Harris

Harrison et al.
Comp. 12-13-59
1
Net Oil Sand 26'
Top Sand -10,355'

False Unit

Comp. Mar. 28, 1960
Injing Pump 6-15-60
1
Net Oil Sand 30'
Top Sand -10,358'

False-Nunnery Unit

Haynes-Nunnery Unit

Comp. Dec. 22, 1959
1
Net Oil Sand 25'
Top Sand -10,378'

Comp. Feb., 1960
Injing Pump 6-1-60
1
Net Oil Sand 22'
Top Sand -10,374'

Mayne S. Busby Unit

Comp. Mar., 1959
1
Net Oil Sand 21'
Top Sand -10,359'

Comp. Jan. 4, 1960
Injing Pump 7-15-60
1
Net Oil Sand 25'
Top Sand -10,315'

Nunnery-Busby Unit

A-1
Staked Jan. 15, 1960
Permit Feb. 17, 1960
Cancelled Oct. 27, 1960

False-Nunnery Unit

Net Oil Sand 0
Top Sand -10,461'

J.E. Busby Unit

Comp. Oct., 1959
A-1
Net Oil Sand 41'
Top Sand -10,357'

Comp. Nov., 1959
1
Net Oil Sand 32'
Top Sand -10,348'

Busby-Guy Unit

Comp. Sept., 1959
Injing Pump 10-14-60
1
Net Oil Sand 25'
Top Sand -10,395'

Comp. Dec. 29, 1959
Workover Mar. 17, 1960
A-1
Net Oil Sand 17'
Top Sand

J.E. Busby Unit

Busby-Guy Unit

Bigline

1
False-Busby Unit

H. P. Nunnery, plaintiff below and appellee here, is the owner of 128 acres of land located in Little Creek Oil Field in Pike County, Mississippi. Sun Oil Company, defendant below and appellant here, owns an oil and gas lease embracing the Nunnery lands. Nunnery sued Sun, charging that Sun had cleared the site for the drilling of an oil well on the 40-acre tract known as the Felder-Nunnery Unit A-1, as shown on a plat which the reporter will reproduce with this opinion. It was charged that Sun was negligent in clearing the site and thereby damaging the surface of Nunnery's land when Sun knew or should have known that it did not intend to drill. Sun admitted clearing the location for the well and damaging Nunnery's property, but contended that when the well site was cleared it fully intended to drill and that in so doing it acted as a prudent operator, and the decision to drill was changed as a result of a great influx of salt water overnight in four adjacent wells, by reason of which it was not reasonable or prudent to drill a well on said location.

The Nunnery lease expressly granted to Sun the right to use the lands for the purpose of investigating, exploring, prospecting, drilling and mining for, producing, and owning oil, gas and other minerals. It is conceded by Nunnery that the drill site was properly prepared and if the well had been drilled he would have had no complaint as to the manner of preparing the site or the amount of land used. The location of the well on the Felder-Nunnery Unit A-1 was on land owned by Nunnery near his home and dairy barn, and the particular location was agreeable to Nunnery. The land sloped toward Nunnery's unused dairy barn. This required a cut in the hillside and the dirt was pushed to the low side of the location so as to make a fill on the low side. The actual area involved in the location was about 1.1 acres. In addition, a road traversed an area from a public road a short distance to the location. This

road was graded and graveled and about a 90x90 foot area of the well site was graveled. The total area including the road and the location involved about two acres of land.

On the trial of the issues, the plaintiff introduced proof concerning the staking of the location, the amount of damage done to his land, and the fact that the well was never drilled. He offered no proof as to the reasons why the location was abandoned by Sun. After the court overruled the motion of Sun to exclude the evidence and enter judgment for the defendant, Sun offered detailed proof concerning the development of that part of the Little Creek Oil Field involved in this case and the reasons why Sun changed its decision to drill the Felder-Nunnery Unit A-1 and abandoned the location. The principal witness in this regard was Thomas C. Aitken, District Petroleum Engineer for Sun, and the following is the substance of his testimony.

The Little Creek Oil Field produces from the lower Tuscaloosa formation. In the latter part of 1959 and the first part of 1960, the part of the field in question was being developed by Sun and a nose-shaped area projected in a southeasterly direction, including the Nunnery property. The annexed map shows the completion dates of eleven wells in this area, including two dry holes presently to be mentioned. On December 29, 1959, the Busby-Guy Unit A-1 was completed and produced salt water with a trace of oil, although the electric log showed a seventeen-foot oil sand. Reworking operations were begun on the Busby-Guy Unit A-1 on March 1, and after exhaustive efforts the well continued making nearly 100 percent salt water with a trace of oil. On March 12, 1960, it was abandoned. In the meantime, the Felder-Rollins Unit No. 1, located on the east line of the south offset to the Felder-Nunnery Unit A-1 (the unit involved in this suit), had been completed late in 1959 and produced 100 percent salt water. The

geologist and the petroleum engineer for Sun concluded as of March 12 that a straight line run from the location of the Busby-Guy Unit A-1 and the location of the Felder-Rollins Unit No. 1 constituted the probable oil-water contact line. As of March 12, 1960, the east offset to the Felder-Nunnery Unit A-1, the Felder Unit No. 1, was being drilled, nearing completion. The drilling of the various wells in the area had shown that there was a gradual dip in the oil sands as the nose-shaped projection in the Little Creek Field developed from the northwest toward the southeast, with the probable oil-water contact line located as above indicated just east of the Felder-Nunnery Unit A-1. Sun's geologist and petroleum engineer knew from the past history of production from the Lower Tuscaloosa sands that water encroachment in the Lower Tuscaloosa occurs suddenly.

On March 20 Sun decided to conduct an interference test between the Busby-Guy Unit A-1, Busby-Guy Unit No. 1, and the J. E. Busby No. 1 to determine whether the sand producing 100 percent sale water in Busby-Guy Unit A-1 was continuous to the other wells involved in the test which were producing oil. An independent engineering firm was employed by Sun to conduct this test, which was begun on March 21, 1961. The three wells were shut in for a twenty-four hour period to stabilize the pressure in that area, and a static pressure test was run on the three wells, after which the pressure gauge was placed back in the Busby-Guy Unit A-1 to remain for twenty-four hours. On March 22, the Busby-Guy Unit No. 1 and the J. E. Busby No. 1 were opened for production at normal rates, while the Busby-Guy Unit A-1 remained shut in. While this interference test was in progress and before it was completed the Felder Unit No. 1, the east offset to the subject lands, began flowing oil and it was determined as of six o'clock, March 22, 1960, that the Felder Unit No. 1 would be a producing oil well.

Therefore, on January 15, 1960, the Felder-Nunnery Unit A-1 here in question had been staked, and on February 17, 1960, a special permit was issued by the Oil and Gas Board authorizing the location of said well at variance with the field rules, because otherwise the well would be too close to the dairy barn on the Nunnery land. On February 17, 1960, Nunnery had written Sun demanding that Sun drill the Felder-Nunnery Unit A-1 because the property was being drained by adjoining wells.

On the afternoon of March 22, the petroleum engineer for Sun sent a dirt contractor to see Nunnery to advise him that on the following morning the location would be cleared for drilling on the Felder-Nunnery Unit A-1, and said contractor talked with Nunnery and made arrangements to have a light wire removed. On the morning of March 23, 1960, the contractor moved in bulldozers and other equipment and cleared the location involved in this suit, which was accomplished in two and a half days working time.

In the meantime, on March 23, 1960, the pressure recording instrument was pulled from the Busby-Guy Unit A-1 about noon and the results charted and calculated and made available to Sun's petroleum engineer late that evening.

The interference test established that the salt water sand was continuous to the oil producing sands, that the salt water bearing sand was the same as the oil bearing sand. The electric log on the Felder Unit No. 1 showed an oil-water contact and was very similar in nature to the Busby-Guy Unit A-1, which was producing 100 percent salt water. It is not clear exactly when the decision was made by Sun to temporarily abandon or suspend drilling operations on the Felder-Nunnery Unit A-1, but the inference is that this decision was made either on the late evening of March 23, 1960, or within two or three days thereafter. This decision was made

based on the results of the interference test which became known on the late evening of March 23, 1960, while the Felder-Nunnery Unit A-1 was being cleared for drilling, and other circumstances including the fact that the Felder Unit No. 1, the east offset to the Felder-Nunnery Unit A-1, showed an oil-water contact and was very similar in nature to the Busby-Guy A-1, which was producing 100 percent salt water, the fact that in the lower Tuscaloosa salt water moves in rapidly or overnight, and that the probable oil-water contact line ran just east of the Felder-Nunnery Unit A-1.

Sun's petroleum engineer testified upon being examined concerning the decision to clear the location on the Felder-Nunnery Unit A-1 before the interference test was completed that "we had a logistical problem." Just what the logistical problem of Sun was at that time and place is not clear, but the inference is permissible that this reference was to the problem of having a site cleared and ready in the event the interference test and other factors justified moving of the drilling rig from the Felder Unit No. 1 to the Felder-Nunnery Unit A-1 upon the completion of the Felder Unit No. 1, which was completed within three days after the location of the Felder-Nunnery Unit A-1 was cleared.

On May 24th Nunnery gave Sun notice by letter to either drill the Felder-Nunnery Unit A-1 or release said lands from the lease. Actual production tests from the Felder Unit No. 1 and other wells in that area during the months between March 28, 1960, through May indicated to Sun that there was no water problem insofar as the Felder Unit A-1 was concerned, and Sun decided to proceed with the drilling of the oil well at the location already cleared, and on June 3, 1960, did further preparations for the drilling of the oil well by graveling a 90x90 foot turn-around area and leveling up some places that had washed out since the original clearing. While this work was going on, and on the night of June 4,

the Busby-Guy No. 1, the northwest diagonal offset to the Felder-Nunnery Unit A-1, had a large increase in salt water production and the same was true in the Felder-Nunnery Unit No. 1, the northeast diagonal offset. All of the other wells in the area began producing excessive amounts of salt water, some increasing in salt water production as much as 530 percent. The decision was then made by Sun that if the Felder-Nunnery Unit A-1 were drilled, it would produce only salt water and would not be a prudent operation. The said unit was finally abandoned without being drilled.

The principal issue in this case is whether the evidence was sufficient to justify the finding that Sun was guilty of negligence by clearing the drilling site when it knew or in the exercise of reasonable care should have known that it would probably not drill an oil well on said property. Negligence was the issue tendered by the declaration and presented to the jury by the instructions. Nunnery's proof did not show any of the facts bearing upon Sun's reason for abandoning the location. He proved he owned the land on which Sun had an oil and gas lease, that Sun prepared the location for drilling an oil well and thereby damaged the land, then abandoned the location and never drilled. We are of the opinion that Nunnery thus made out a prima facia case of liability. Sun had the right to go upon the lands for all reasonable purposes to explore or drill for oil and gas and make reasonable use of a reasonable amount of land for such purposes. Union Producing Co. v. Pittman, 245 Miss. 427, 146 So. 2d 553 (1962). The geological and other technical data involving the probability of the Nunnery location producing oil or gas in commercial quantities if drilled was in the sole possession of Sun. It alone was capable of bringing to the court the facts determinative of (1) whether the abandonment of the Felder-Nunnery Unit A-1 was the act of a prudent operator, that is, whether the well would

probably produce oil and gas in paying quantities if drilled, and (2) whether Sun knew or in the exercise of reasonable care should have known at the time of clearing the location that it would probably not drill. In effect, the evidence offered by Nunnery established that Sun had damaged his land without drilling, and apparently without reasonable relation to the purposes of the lease. This was enough to take the case to the jury, and if Sun did not wish to hazard the risk of submitting the case on plaintiff's evidence alone, it had the duty of going forward with its proof, which was peculiarly within its knowledge. Sun did not desire to take that risk and did in fact go forward with its proof. See 9 Wigmore, Evidence § 2489 (3rd ed. 1940).

As already stated, Sun brought out in full the pertinent facts concerning the special problems involved in developing that part of the Little Creek Field where Nunnery's land was located.

There is little or no dispute concerning whether Sun acted as a prudent operator in first temporarily and then finally abandoning the Felder-Nunnery Unit A-1 location. We hold that the proof established as a matter of law that both the temporary and final abandonment were the acts of a prudent operator and, therefore, negligence may not be predicated on that act alone.

The remaining question is whether under all the evidence the jury was justified in finding that Sun knew, or as a prudent operator having due regard to the interest of both itself and Nunnery, should have known at the time of clearing the location that it would probably not drill for oil. We hold the evidence sufficient.

At the time Sun began clearing the Felder-Nunnery location on March 23, 1960, it knew (1) that the Lower Tuscaloosa sand formation was subject to sudden flooding by salt water; (2) that an interference test was then being conducted for the purpose of determining whether the sands producing salt water in

the Busby-Guy Unit A-1 was continuous to oil producing sands in the other two units involved in the test, and the fact that the depth of the top of the sands in the three wells varied only a few feet; (3) that the probable oil-water contact line established March 12, 1960, ran diagonally across the west offset to the Felder-Nunnery Unit A-1, and (4) the Felder Unit No. 1, the east offset to the unit in question, had an oil-water contact and was similar in nature to the Busby-Guy Unit A-1 which was producing 100 percent salt water. The jury had a right to take all of these facts into consideration along with the fact that Sun had a logistical problem involved in clearing the location in question. And the jury also must be presumed to have drawn from the evidence every permissible inference.

 We are of the opinion that the jury would have been justified in inferring that under all the circumstances Sun did not act reasonably, or prudently, when it began clearing the location only hours before the interference test was completed. The result of the interference test was the only fact that Sun did not have when it made the decision to clear the location and which it did have when it changed the decision to drill and temporarily abandoned the location. The jury was justified in believing if Sun had delayed clearing the location one day it would not have been necessary to damage Nunnery's property, for by that time it would have had all the information on which it based the decision to temporarily abandon the location until sustained production tests could be run on the Felder Unit No. 1. The jury could also have properly inferred that because of logistical problems involving the drilling rig, then about ready to be moved from the Felder Unit No. 1, or the availability of a dirt contractor to clear the location, it decided to clear the location when it did to accommodate its logistical problem at the probable expense of Nunnery. Undoubtedly Sun would have thought

it unwise and imprudent to have committed itself to the costs of drilling the well before completion of the interference test, and a proper regard to the interests of the lessor should have dictated the same decision regarding the clearing of the location. It is not our function to draw inferences or to determine what particular inference the jury drew from several permissible ones; but it is our duty, when reviewing the evidence to determine whether it justifies a certain result reached by the jury, to determine what inferences the jury could legally draw from the evidence. It is clear to us that the jury was justified in finding that when Sun cleared the location at the time it did and under the particular circumstances, it was not acting as a prudent operator and that it did so without due regard to the interests of Nunnery.

The fact that Sun made another decision to drill about June 1, 1960, and did some additional preparation on the location on June 3 and 4, 1960, before it learned of the advent of salt water on the night of June 4, does not alter what we have said, for at that time the damage had been done. The act of clearing the location beginning March 23 was either negligently done or not depending on what Sun knew or should have known at that time, and the quality of the act could not be affected by what was done or what was learned by Sun in June.

 Sun had the unquestioned right to do whatever was reasonably necessary to develop the Nunnery land, including clearing the location, without liability for the resulting damage. Although this is a negligence action, the case grows out of the relationship of lessor and lessee and whether Sun was negligent is measured by the external standard of the prudent operator which this Court recognizes as the broad standard in cases of this kind. *Cf.* Monsanto Chemical Co. v. Sykes, 245 Miss. 207, 147 So. 2d 290 (1962).

In Coffindaffer v. Hope Natural Gas Co., 74 W. Va. 109, 81 S.E. 966 (1914), the lessee built a road across plaintiff's lands, as it had a right to do under the terms of the lease. Lessee acted in good faith and built the road in a careful manner for the purpose of hauling a drilling rig and tools and machinery for drilling. The lessee abandoned its purpose to drill and the court held that technically it was not exercising its right to drill; and that while the lessee acted in good faith, the subsequent abandonment of its purpose to drill (for what reason is not shown) made it a trespasser *ab initio,* and liable to the landowner in damages for the injury to the land. *Coffindaffer* is not helpful. It was decided before the development of the law concerning the rights of the parties to oil and gas leases. It did not take into account the prudent operator rule. We are unable to follow the reasoning of the West Virginia Court in holding that one who rightfully enters land in good faith subsequently becomes a trespasser because of something it later omitted doing. The case is not persuasive and we reject its reasoning. We know of no other similar case from this or any other jurisdiction.

██ █ Sun next contends that it was not liable to Nunnery because it had offered to reasonably restore Nunnery's premises and Nunnery had declined to permit Sun to do so. The evidence shows that Sun did make such offer and Nunnery refused because Sun would not restore the top soil. We are of the opinion that this offer by Sun and Nunnery's refusal does not relieve Sun from liability. There is no showing that the damage to Nunnery's property increased because of Nunnery's refusal to allow Sun to restore the property. The rule requiring Nunnery to minimize his damages does not apply so as to deny recovery.

The court instructed the jury for Nunnery that the measure of damages was the difference in the value of the land before the injury and its value after the injury.

Nunnery's proof was that the value of the whole 128 acre tract was worth a certain sum before the injury and after the injury was worth $2500 less.

Sun offered undisputed evidence that the land could be restored substantially to its former condition by pushing the gravel into the low places and leveling the entire location to its former contour, including the re-establishment of the terraces, at a cost of $437.50; and that the location could be fertilized and seeded in grass for about $75.00 per acre. An electric extension line was removed and an unused water line cut. It was not shown what the repair of these two items would cost but it obviously involved a small amount of money. Nunnery's proof showed that if the land is restored the top soil would be lost and it would not produce grass. The value of the land was estimated by the witnesses as high as $200 per acre.

 If the damage to the land is permanent, the measure thereof is usually the difference between the fair market value of the entire tract before the injury and the fair market value after the injury. Baker v. State Highway Commission, 204 Miss. 166, 37 So. 2d 169 (1948). But if the damage is temporary or if the damage involved only a small part of a larger tract without affecting the remainder, the before and after rule does not apply. Gulf Refining Co. v. Davis, 224 Miss. 464, 80 So. 2d 467 (1955); Southland Co. v. Aaron, 221 Miss. 59, 72 So. 2d 161, 49 A.L.R. 2d 243 (1954). In Baker v. Miss. State Highway Commission, *supra,* the Court stated that in unusual cases when the before and after rule is not applicable, the trial court should adopt such rule as in reason and fairness to the parties is best designed to enable the jury to arrive at the true amount of the damages. Thereafter in South-land Co. v. Aaron, *supra,* the Court adopted the proper rule when the total damage is temporary. The before and after rule is not applicable in the instant

case because (1) the remaining tract will not be damaged if the location is restored, and (2) the injury is partly reparable. The proper measure of damages in order to fully compensate Nunnery at the least burden to Sun, which is the object of every such rule, should be one suitable to the unusual features of this case as suggested in Baker v. Miss. State Highway Commission, *supra*. ■■ The specific items measuring the damages in this case should consist of (1) the cost of substantially restoring the damaged area by leveling the land to its former contour and the re-establishment of the terraces; (2) the cost of fertilization and planting of grass seeds on the restored area; (3) the cost of repair of the light wires and water line; and (4) such sum as would fully compensate Nunnery for the reduced productivity of the two acres because of the loss of top soil. ■■ Under the proof in this case, if the jury had been thus instructed it could not have rendered a verdict for as much as half of the $2500 it rendered in applying the before and after rule.

Accordingly, the case is affirmed as to liability and reversed and remanded for trial on the issue of damages only.

Affirmed as to liability; reversed and remanded for trial on the issue of damages only.

*Kyle, P. J., and Ethridge, Rodgers and Patterson, JJ.,* concur.