908 So.2d 848 (2005)
EOG RESOURCES, INC., f/k/a Enron Oil & Gas Company, Nat Prestage, Douglas McKibben and Crownpointe Resources, Inc., Appellants
v.
Mark TURNER and Nita Turner, Appellees.
No. 2003-CA-01572-COA.
Court of Appeals of Mississippi.
August 9, 2005.
*850 Christy Michelle Sparks, Donald James Blackwood, Glenn Gates Taylor, Ridgeland, attorneys for appellants.
David Ringer, attorney for appellees.
Before BRIDGES, P.J., CHANDLER and ISHEE, JJ.
CHANDLER, J., for the Court.
¶ 1. Mark and Nita Turner sued EOG Resources, Inc. (formerly known as Enron Oil & Gas Co.) its agent, Crownpointe Resources, Inc., and several of Crownpointe's representatives for damage to the surface of two parcels of property caused by EOG's oil operations pursuant to a mineral lease. The Chancery Court of Simpson County awarded the Turners $60,250 in compensatory damages and $27,000 in attorney's fees. EOG, Crownpointe, and Crownpointe's representatives appeal, arguing (1) that the chancellor applied the wrong legal standard in determining whether to hold EOG liable to the Turners; (2) that, under the correct legal standard, there was insufficient evidence to support a finding for the Turners; (3) that the chancellor erroneously relied upon a post-trial appraisal report in calculating damages; (4) that parts of the appraisal report upon which the chancellor relied were not properly before the court; (5) that the chancellor erroneously found that a gravel pit upon which EOG built an oil well contained commercial gravel; (6) that the chancellor erroneously assessed damages for the cost of surface restoration; (7) that the Turners were estopped from claiming that EOG improperly selected the well site; and (8) that the award of attorney's fees was erroneous.
¶ 2. Since EOG's first and second issues are dispositive of this appeal, we do not address EOG's other assignments of error. We find that the chancellor applied an incorrect legal standard in holding EOG liable for surface damage. We further find that, applying the correct legal standard, the evidence was insufficient to support a finding for the Turners because there was no proof that EOG wantonly or negligently damaged the surface or used more of the surface than was reasonably necessary to conduct its oil and gas operations. Therefore, we reverse the judgment of the chancery court and render a judgment in favor of EOG, Crownpointe, and Crownpointe's representatives.

FACTS
¶ 3. The following facts were adduced before the chancery court. On June 14, 1951, Thomas Cox conveyed to D.W. Smith the southwest quarter of the southwest quarter of Section 20 (the "North Forty") and the northwest quarter of the northwest quarter of Section 29 (the "South *851 Forty"), both in Township 1 North, Range 2 East in the Merit field. The deed from Cox to Smith contained a mineral rights reservation, which provided, "[a]ll the minerals, oil and gas, together with any and all rights pertaining thereto, are expressly reserved on this land, and there is also reserved such rights-of-way as may be desirable or necessary to the development and use of the reservations herein." Subsequently, EOG leased the estate created by the mineral reservation.
¶ 4. In approximately January 1997, EOG began fieldwork to locate the Cox No. 1 well. EOG hired Crownpointe as its agent for negotiations with surface landowners and to assist with fieldwork. At that time, Nita Turner and her mother, Sue Garner, owned the surface of the North Forty as joint tenants. Sue Garner also owned an undivided one-half interest in the South Forty, and Dewey Smith Jr. and his wife owned the other one-half interest.
¶ 5. It was customary for EOG to obtain advance settlements of surface damages in order to establish good relationships with surface owners and to contractually expand EOG's legal rights beyond the rights it already had as a mineral lessee. In February 1997, Doug McKibben, a representative of Crownpointe, contacted Garner in an effort to reach an advance settlement of surface damages for EOG's planned activities on the North Forty and the South Forty. McKibben offered Garner $500 if she would sign a "Surface Use and Damage Release Agreement." The agreement provided for the surface owner's grant to EOG of a right-of-way easement and a surface easement for access, ingress and egress for construction and maintenance of a drilling pad and production facilities. The agreement stated, inter alia, that the surface owner would indemnify EOG from all damages to persons or property arising from EOG's use of the land. The agreement also provided that EOG would restore the property in the manner customary to the petroleum industry and in accord with Mississippi's rules and regulations. Garner referred McKibben to Nita, who was negotiating on behalf of Garner. Nita refused the offer.
¶ 6. By approximately March 1997, EOG had decided to locate the Cox No. 1 well atop an unused gravel pit in the northwest corner of the South Forty. At that time, the Turners lacked any ownership interest in the South Forty. Due to drilling requirements, the well would be directionally drilled beginning at the gravel pit, with the well's bottom hole to be located southeast of the pit in the South Forty. EOG's employees and representatives testified that the gravel pit was selected as the site to begin directional drilling due to its size, its elevation, its flatness, the ease with which it could be smoothed, and the fact that it had an existing road. Since there were no trees present in the gravel pit, timber damage would be minimized. Further, one surface owner, Dewey Smith, Jr., favored use of the pit because it had been used as a garbage dump, which EOG would clean up before drilling the well. Smith, Jr. had signed a surface damage agreement.
¶ 7. EOG was also considering routes for a gravel-topped access road that would attach the well site to a public road. The access road would be used to haul heavy drilling equipment to and from the well site and also would be used by tanker trucks. EOG initially considered a road route that would approach the well site from the west across property owned by the Turners' relatives. Due to safety concerns with the adjoining highway and title problems with the properties involved, EOG rejected that plan.
*852 ¶ 8. In March 1997, McKibben met with Nita and Mark Turner for further negotiations concerning an advance settlement of surface damages. McKibben informed the Turners that EOG had decided not to locate the road across the property owned by the Turners' relatives. EOG was now contemplating an access road that would run from the well site northeast through the North Forty and connect with Wilson Welch Road.
¶ 9. The Turners stressed to McKibben that, in 1996, Nita had entered into a stewardship plan concerning the North Forty. The stewardship plan was a written agreement in which Nita agreed to act as a good environmental steward of the property. The plan indicated that the North Forty had been clearcut in 1994. Nita testified that the plan included government funding for timber planting, but that the funding had been delayed. The plan specified that Nita planned to construct a retirement cabin "on the crest of a large, flat ridge" providing a view of the surrounding countryside. Nita told McKibben that, due to the stewardship plan, she did not want EOG to touch the North Forty and, especially, the ridge where the cabin was specified.
¶ 10. McKibben told the Turners that EOG's planned access road through the North Forty would traverse the ridge. Due to the planned cabin, the Turners preferred that the access road be constructed south of the ridge along the borderline dividing the North Forty and the South Forty. At the Turners' request, McKibben agreed to investigate an alternative road location as that would be as far south of the ridge as possible. He flagged a more southerly road location and proposed it to EOG. EOG approved it. But, when McKibben showed the proposal to Nita, she stated that it was unacceptable and again refused to sign the surface damage agreement. When asked to name a price to sign the agreement, Nita wrote a note demanding $250,000 for EOG to go anywhere on the North Forty, $150,000 for EOG to go around its edges, or EOG could "go someway other than my forty."
¶ 11. On April 2, 1997, the Turners' attorney notified Crownpointe that the Turners now were represented by counsel. The letter indicated the Turners' willingness to negotiate a surface damage agreement if EOG gave the Turners a courses and distances description, a description of the well site, and omitted "any subsequent wells" from the coverage of the agreement. On April 28, Crownpointe responded by sending a plat map of the proposed well site and the proposed southerly access road, along with a letter stating that it would commence surface operations pursuant to the mineral lease as soon as possible and was willing to make a fair settlement for damages. There is no indication that the Turners responded to Crownpointe's letter until negotiations resumed in June 1997. On April 4, 1997, Garner conveyed her undivided one-half interest in the South Forty to Mark and Nita, retaining a life estate for herself.[1] On April 25, 1997, EOG applied for a permit to drill the Cox No. 1 well.
¶ 12. On May 12, 1997, McKibben sent a memo to Nat Prestage, another representative of Crownpointe, concerning two potential routes for the access road. The memo stated, in pertinent part:
The first possible route is one selected in an attempt to satisfy landowner wishes. This alternate route was surveyed *853 and is set out in the referenced plat. The alternate route places the road as far to the south as possible for us to build because of terrain. This is not the best location for our purposes, but it is acceptable. This route will also involve more damage to timber, although the appraised value of this timber would not be high.
The second possible route, and the best location for us, would be entering the forty along the East boundary thereof approximately 500 feet North of the Southeast corner and running Southwest approximately 45 degrees. This route is along or near a ridge top and through cut over land where there would be no or minimal timber damage. The land owners wanted to save this area for their future use.
. . .
Obviously the preferred course of action would be for us to operate in a manner that would be considered a "good neighbor" and seek a mutually acceptable compromise settlement. However, at this point in time the land owners have not responded to our request for settlement in any reasonable manner. In the absence of a negotiated agreement with the land owners, I would suggest we utilize the second route listed above which will minimize our construction cost and timber damage cost. It would not make good business sense for us to cause increased actual damages to the land owners timber if we will be held accountable for this damage in some future legal proceeding.
¶ 13. On June 24, the Turners, through counsel, resumed negotiations concerning the Turners' execution of a surface damage agreement. EOG offered the Turners $2,500 to sign the agreement and again stated that it planned to commence surface operations right away. The Turners responded, complaining that EOG's decision to drill the well in the unused gravel pit would cause them economic detriment because the well's presence would prevent their future removal of gravel from the pit. The Turners also complained about EOG's decision to build the access road across the North Forty, contending that EOG should build the road to the west across the land owned by the Turners' relatives. On June 25, 1997, EOG decided to commence operations without obtaining a surface damage agreement from the Turners. EOG built its 2.31 acre well site on the gravel pit and cleared 1.43 acres for the access road, which it built along the ridge. Mark testified that, due to EOG's cut into the ridge, they would no longer be able to build the cabin at their preferred elevation unless they rebuilt the ridge or placed the cabin upon piers. Nita stated that EOG's placement of its road atop her ridge made her feel like "a rape victim."
¶ 14. Approximately one month later, the Turners sued, demanding injunctive relief and three million dollars in actual and punitive damages for EOG's failure to reasonably accommodate their surface interests and for violations of federal environmental law.[2] At the hearing, which occurred in October 2000 and May 2001, a question was raised of whether there was commercially valuable gravel present at the well site. The chancellor appointed an appraiser to assess "what damages are actually there" and to obtain core samples to "tell you what gravel is there and what *854 it's worth and what it's not." The chancellor also visited the property.
¶ 15. On June 6, 2002, the chancellor entered an order finding that EOG, as the lessee of the mineral estate, had the right to use the surfaces of the North Forty and the South Forty for mineral exploration. However, the chancellor held that EOG's use of the well site and access road had severely limited the Turners' use of those areas and changed the nature of the surface, causing the Turners to suffer a loss. The court awarded the Turners $27,250, representing the appraised value of the land underlying the well site and access road and the costs of restoring those lands to their previous conditions. Though the appraisal had concluded that little gravel was present at the well site, the court also awarded the Turners $33,000, representing the amount which "the money received from the removal of the gravel would earn at 6% for ten years, this being an approximate amount of years that the well would be expected to produce." Approximately one year later, the court entered a final judgment awarding the Turners $27,000 in attorney's fees based upon the fact that Prestage, a former attorney, had contacted the Turners after they were represented by counsel.

STANDARD OF REVIEW
¶ 16. This court will not disturb a chancellor's fact-findings unless they are manifestly wrong or clearly erroneous. Estate of Grubbs v. Woods, 753 So.2d 1043, 1046(¶ 7) (Miss.2000). However, the chancellor's misperception of the correct legal standard to be applied presents a question of law that is reviewed de novo. Id. at 1047(¶ 10).

LAW AND ANALYSIS

I. WHETHER THE CHANCELLOR APPLIED AN INCORRECT LEGAL STANDARD IN DECIDING TO HOLD EOG LIABLE FOR SURFACE DAMAGE.
¶ 17. EOG contends that the chancellor erroneously applied a strict liability standard in holding EOG liable for surface damage to the North Forty and to the South Forty. Before discussing the chancellor's statement of the applicable law, we set out the well-established rights of the owner of the mineral estate to use the surface of the land.
¶ 18. In short, a mineral owner or a lessee of the mineral estate, in the absence of additional rights expressly conveyed or reserved, may use as much of the surface as is reasonably necessary to exercise its right to recover minerals, without liability for surface damage. Union Prod. Co. v. Pittman, 245 Miss. 427, 433-34, 146 So.2d 553, 555 (1962). This right means that the mineral lessee can "go on the land and do all those things necessary and incidental to the drilling of a well" and has the absolute right to select the place for drilling the well. Id. at 434, 555, 146 So.2d 553. However, the mineral lessee will be liable to the surface owner for damages if the lessee wantonly or negligently destroys the land or uses more land than is reasonably necessary for its mineral exploration and production operations. Id. This has been termed the "prudent operator standard." Sun Oil Co. v. Nunnery, 251 Miss. 631, 645, 170 So.2d 24, 31 (1964). In discussing this limitation on the mineral owner's surface use, it has been said that the mineral owner must not be unreasonable, oppressive, or capricious in its use of the land. Union Prod. Co., 245 Miss. at 434, 146 So.2d at 555. While surface owners claiming damages occasionally have characterized the mineral owners's destruction of the surface as a trespass or a nuisance, our supreme court has consistently addressed this issue by examining *855 whether the mineral owner wantonly or negligently harmed the surface or used more land than reasonably necessary for its operations.[3]See Charles F. Hayes & Assoc. v. Blue, 233 So.2d 127, 128 (Miss. 1970); Placid Oil Co. v. Byrd, 217 So.2d 17, 18 (Miss.1968). It must be emphasized that this right enures to the mineral estate in the absence of surface leases or other agreements expressly granting the mineral owner rights to use the surface of the land. Reynolds v. Amerada Hess Corp., 778 So.2d 759, 762(¶ 12) (Miss.2000). Surface leases, surface damage agreements, or other contractual arrangements favoring the mineral estate merely expand the mineral owner's extant right to use as much of the surface as is reasonably necessary to conduct its operations. Id.
¶ 19. In Larco Drilling Corp. v. Lee, 207 So.2d 634, 635 (Miss.1968), the surface owners claimed that Larco, the mineral lessee's drilling contractor, owed them damages for negligently destroying a building site where they planned to build a home. The court held that, because there was no proof that the mineral lessee had used more of the surface than reasonably necessary to conduct its oil and gas operations or had negligently prepared its well site, Larco was not liable for damage to the home site. Id. In Gulf Refining Co. v. Davis, 224 Miss. 464, 470, 80 So.2d 467, 469 (1955), the court found that the oil and gas company had the right to dig a slush pit for salt water storage and, when the pit filled up, to build a second, larger pit. The oil company could be held liable only if it had negligently allowed salt water to overflow from the pits onto the surface owner's land. Id. And, in Westmoreland v. California Co., 240 Miss. 562, 565, 128 So.2d 113, 113 (1961), the court affirmed the lower court's finding that the mineral lessee was not liable to the surface owner for its placement of a well on a gravel pit because there had been no showing that the mineral lessee had negligently located the well. Finally, in Sun Oil Co., the court upheld a damage award to the surface owner for the mineral lessee's clearing of a location for an oil well that was never drilled due to an influx of salt water in adjoining wells. Sun Oil Co., 251 Miss. at 644, 170 So.2d at 30. The court held that the jury was justified in finding that the lessee had been negligent in clearing the well location because it did so without waiting for the results of a test that showed the well would be a failure. Id. at 30, 644-45, 170 So.2d 24.
¶ 20. We turn to the findings of the chancellor in the case sub judice. The chancellor recognized that EOG had a "right to use the surface of any property for which they have a lease or ownership interest in the minerals that lie beneath the surface" and that the use must be "just, reasonable and necessary." But the chancellor then stated that, in exercising its right to use the surface, EOG had a duty to ensure that "the property owners are properly compensated for the use and damages that result from said exploration activities." This is not the law. Clearly, EOG had the right to damage as much of the surface of the North Forty and of the South Forty as was reasonably necessary to its oil and gas operations and had no obligation to compensate the Turners for surface damage in the absence of negligence or its use of more land than was reasonably necessary to conduct its operations. Union Prod. Co., 245 Miss. at 433-34, 146 So.2d at 555. Further, the mineral reservation under lease to EOG provided it *856 with the additional right to establish "such rights-of-way as may be desirable or necessary to the development and use of the reservations herein."
¶ 21. The chancellor went on to state that, because of EOG's use of the property: "any use by the landowners is either a non-use or one that it so severely restricted as to amount to a taking of said property for as long as the same is being occupied for the removal of minerals from beneath the surface." The chancellor based this finding on the fact that EOG had required the Turners and the chancellor to don hard hats while visiting the well site, indicating EOG's domination of the site. The chancellor found that the Turners had suffered a compensable loss because EOG's operations prevented them from removing sand or gravel from the well site and because EOG's access road "would or could change or increase the cost of some other type development that did not require the use of the road" and "changed the nature of the surface."
¶ 22. Thus, the chancellor found the Turners were entitled to compensation based upon the mere facts of EOG's use of and damage to the surface. Notwithstanding the additional surface rights included in the mineral reservation, absent negligence, EOG had the right to use the surface and to damage the surface to the extent reasonably necessary to exercise its right to extract the minerals. Id. The chancellor never found that EOG's use of the surface was negligent or that it had used more of the surface than reasonably necessary to conduct its oil and gas operations. Therefore, the chancellor applied an incorrect legal standard in holding EOG liable to the Turners for surface damage. We must reverse the chancellor's judgment for the Turners.
¶ 23. In what is best characterized as an assertion that we should affirm the chancellor's finding of liability on other grounds, the Turners argue that EOG had a duty to reasonably accommodate the surface owners and a duty to afford them due regard. The Turners aver that these duties required EOG to accommodate their future plans for the property. The Turners cite no authority for the existence of a duty of reasonable accommodation, and it is clear that the controlling precedent, discussed above, imposes no such duty.[4]
¶ 24. The Turners correctly argue that the owner of the mineral estate has a duty of due regard to the surface owner. The duty of due regard between the surface owner and the mineral owner means that each
should exercise that degree of care and use which is a just consideration for the rights of the other. The owner of the surface of the land has the right to enjoy the land free from annoyance, except such as reasonably arises from the opening, exploitation, mining, and marketing *857 of the minerals. The mineral owner on the other hand is not limited by the fact that his acts may cause inconvenience to the surface owner.
Id. at 433, 146 So.2d at 555. Thus, the mineral owner does not breach its duty of due regard by reasonably conducting its "opening, exploitation, mining, and marketing of the minerals" in a manner causing annoyance or inconvenience to the surface owner. The duty of due regard does not require the mineral owner to obtain the surface owner's approval of every activity it plans to engage in on the property. The Turners' characterization of the applicable legal standard is without merit.

II. WHETHER, APPLYING THE CORRECT LEGAL STANDARD, THERE WAS SUFFICIENT EVIDENCE TO SUPPORT A FINDING FOR THE TURNERS.
¶ 25. EOG argues that, applying the correct legal standard, the evidence was insufficient to support a finding that EOG was liable for surface damage. We agree. The evidence was insufficient to show that EOG acted as anything less than a prudent operator in its location of the well site and the access road on the North Forty and on the South Forty.
¶ 26. "[T]he mineral owner or agent is not the final judge as to what is reasonably necessary," and, when the testimony is conflicting, the question of what surface damage was reasonably necessary is a fact issue for the chancellor. Union Prod. Co., 245 Miss. at 434-35, 146 So.2d at 556. In the instant case, because there was no credible evidence that EOG was negligent or used more land than reasonably necessary, there is no fact issue necessitating remand. We have already set out the testimony concerning EOG's consideration of numerous factors in deciding to locate the well site on the unused gravel pit. That evidence indicates that EOG was not negligent in selecting or constructing the well site and used no more land than was reasonably necessary. There was also copious evidence showing that EOG's selection of the site for the access road and its construction of the road were reasonable and non-negligent.
¶ 27. The Turners complain that EOG did not have to build the road on the North Forty because it could have accessed the well site from the west across property owned by their relatives. The Turners aver that these relatives offered to grant EOG easements across some of the property for little or no consideration. McKibben and Stephen Himes, a landman with EOG, testified that, while EOG initially was interested in the westerly route, the route was rejected due to safety concerns with the connecting highway. This highway had a blind curve near the place where EOG's heavy trucks would have entered the road. Further, EOG's use of the westerly route would have required it to obtain additional surface grants, easements, or right-of-ways across off-unit acreage in which it lacked mineral interests. Some of the land involved in constructing the westerly route was burdened by title problems, and one landowner refused to grant an easement to EOG until an estate was closed. Certainly, EOG was not obligated to combat these difficulties when it had the right as the mineral lessee to access its well from the North Forty, and it was not negligent in electing to forego the troublesome westerly route.
¶ 28. EOG's selection of the ridge rather than the southerly route for the access road was likewise within its right to reasonably use the surface of the North Forty to conduct its operations. The route over the ridge was deemed the most cost-effective route because, due to the presence of existing logging roads, it only required the construction of approximately six hundred *858 feet of new road and the widening of the old roads. The ridge provided the extra support preferable for the heavy drilling equipment that EOG planned to haul over the road. And, as shown by McKibben's memo to Prestage, EOG also was concerned that, if it constructed the southerly route it had proposed to the Turners without securing their damage waiver, EOG could be liable to the Turners for damaging more land and timber than reasonably necessary for the access road.
¶ 29. The Turners did not present any evidence, save their own opinions, that tended to show EOG was negligent or used more land than reasonably necessary for its operations. The only evidence that EOG used more land than reasonably necessary for the road was Mark Turner's testimony that he personally had measured the road. In Mark's opinion, EOG had cleared more area than was required for the passage of heavy trucks. However, Mark admitted that his opinion was based on his knowledge of the clearance necessary for logging trucks and that he had no knowledge of how much clearance was needed for tanker trucks or to move heavy drilling equipment around curves. During the testimony of Frank Burton, a superintendent of oil field construction for the company that built the access road, it was established that trucks hauling oil field equipment can be up to eighty feet long and need wider clearance than logging trucks. Every witness for EOG who was questioned about the road testified that the road was prudently and reasonably constructed for its intended use as an access road for oil and gas operations. There was no record evidence refuting this contention. The proof established as a matter of law that EOG acted as a prudent operator in locating and building the well site and the access road.

CONCLUSION
¶ 30. There was simply no evidence in the record to support a finding that EOG was wanton or negligent in its selection or preparation of the well site or access road, or that EOG used more land than was reasonably necessary to conduct its oil and gas operations. It is apparent from the proceedings below that the Turners' primary complaint about EOG's operations was EOG's construction of the access road upon the ridge where the Turners had planned to build a retirement cabin. As established above, EOG was within its rights as the mineral lessee in locating its access road upon the ridge. EOG expressed its willingness to contract with the Turners to build the road in a more southerly location that would have preserved the ridge, but the Turners did not accept that proposal. Since the evidence establishes as a matter of law that EOG acted within its rights as the mineral lessee, we reverse and render a judgment in favor of EOG, Crownpointe, and its representatives.
¶ 31. THE JUDGMENT OF THE CHANCERY COURT OF SIMPSON COUNTY IS REVERSED AND RENDERED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEES.
KING, C.J., BRIDGES AND LEE, P.JJ., IRVING, MYERS, GRIFFIS, BARNES AND ISHEE, JJ., CONCUR.
NOTES
[1] Nita testified that, in October 2001, Garner conveyed her interests in the North Forty and the South Forty to Nita.
[2] This case was removed to the United States District Court for the Southern District of Mississippi, which remanded the case to the chancery court upon a finding that the Turners' allegations that EOG had violated federal environmental statutes failed to state a claim upon which relief could be granted.
[3] Nuisance and trespass are viable theories of recovery for damage to land adjoining an oil and gas operator's property caused by the operator. See Blue v. Charles F. Hayes & Assoc., 215 So.2d 426, 429 (1968)
[4] The Turners argued throughout the proceedings that the presence of gravel on the surface of the South Forty rendered them owners of a surface mineral estate, which, they contended, imposed a duty upon EOG to reasonably accommodate their interests as surface mineral owners. This argument is without merit. By the terms of the mineral reservation, EOG owned the entire mineral estate. Therefore, if gravel was part of the mineral estate, then any gravel on the surface would belong to EOG in addition to any minerals underlying the surface. Thus, there would be no merit to the Turner's claim of mineral estate ownership. In fact, any gravel located on the North Forty or on the South Forty was part of the Turners' surface estate. This is because the mineral reservation sub judice did not specifically reserve gravel. Witherspoon v. Campbell, 219 Miss. 640, 650, 69 So.2d 384, 388 (1954) (stating, "if the term "minerals" [in a mineral reservation] is to include all of the gravel on the land, the conveyance should specifically so declare").