ISHEE, J.,
for the Court:
FACTS
¶ 1. On October 28, 1937, Appellant Connie Mack Douglas’s grandparents, M.R. Douglas and his wife, Connie Douglas, exe *914 cuted an oil, gas and mineral lease (the Douglas Lease) to R.P. Brewer Jr.,[1] covering the following land located in Lincoln County, Mississippi:

TOWNSHIP 6 NORTH, RANGE 8 EAST

Section 11: The SW 1/4 of the NW 1/4; the SE 1/4 and the Wl/2 of the SW 1/4, less and except 5 acres off the West side of the NW 1/4 of the SW 1/4 and 15 acres off the West side of the SW 1/4 of the SW 1/4.
At the time the Douglas Lease was executed, Douglas’s grandparents owned the property in fee simple.
¶2. The Douglas Lease granted Chevron the right to explore for oil, gas, and other minerals on the described property. The Douglas Lease contained a ten-year primary term and continued thereafter as long as production or operations were in effect.
¶ 3. On December 2, 1937, in the Lincoln County Land Records Book 197, Page 481, M.R. Douglas et ux., executed a Mineral Deed unto J.C. Vaughn Jr., conveying an undivided one-half mineral interest in the SW 1/4 of the SW 1/4 of Section 11, Township 6 North, Range 8 East, Lincoln County, Mississippi, less and except fifteen acres off of the West side,[2] and other lands. The deed describes the rights to include:
TO HAVE AND TO HOLD the said undivided interest in all of the said oil, gas, and other minerals in, on and under said land, together with all and singular rights and appurtenances thereto in any wise belonging, with the right of ingress and egress, and possession at all times for the purpose of mining, drilling, and operating for said minerals and the maintenance of facilities and means necessary or convenient for producing, treating and transporting such minerals and for housing and boarding employes [sic], unto said grantee, his heirs, successors, and assigns forever; and Grantor herein for himself and his heirs, executors, and administrators hereby agrees to warrant and forever defend all and singular the said interest in said minerals, unto the said Grantee, his, heirs, successors and assigns....
¶ 4. On March 6, 1940, in the Lincoln County Land Records Book 217, Page 559, M.R. Douglas et ux., executed a Mineral Deed unto Hugh V. Murray, conveying an undivided mineral interest in the following:
South west quarter (1/4) of the North West Quarter (1/4) and the South Half (1/2) of the South West quarter (1/4) and the North West Quarter (1/4) of the South West Quarter (1/4) all in Section 11 Township 6 North, Range 8 East, less fifteen (15) acres on the west side of the south west quarter (1/4) of the South West quarter (1/4) less five (5) acres on the west side of the north west quarter (1/4) of the south west quarter (1/4), all in Section 11, Township 6 North, Range 8 East.
The deed conveyed the same right of ingress and egress and “the rights, privileges, appurtenances thereunto ... to said Grantee herein his or her heirs, successors, and assigns forever.” The deed further provided the grantee the “right to remove from said land all of Grantee’s property and improvements.”
¶ 5. On January 5, 1945, Chevron obtained a permit to drill the M.R. Douglas *915 Unit No. 2 No. 1 Well (the Well) from the Mississippi Oil and Gas Board (the Board). On October 27, 1947, Chevron began drilling the Well. Chevron soon completed its work, and the Well became a producing oil well in the Mallalieu Field.
¶ 6. On October 29, 1954, M.R. Douglas et ux., executed a Warranty Deed unto Jewel Douglas (Jewel) and his wife, Hollice Douglas (Hollice), as tenants in common, conveying the surface estate of the Land. The grantors reserved “all mineral and royalty interest of every kind and character in the oil, gas, and other minerals and royalty now owned by the undersigned grantors in a producing oil well located on the SW 1/4 of the SW 1/4, less fifteen acres on the West side, Section 11, Township 6 North, Range 8 East, Lincoln County, Mississippi, which mineral and royalty interest we reserve unto ourselves.” Jewel and Hollice are Appellant Connie Mack Douglas’s parents.
¶ 7. On October 29, 1954, M.R. Douglas et ux., executed a Warranty Deed unto his daughter, Mrs. Will Ann Douglas Smith, conveying “the following described personal and real property, together with all improvements located thereon[:]”
All mineral and royalty interest of every kind and character in and to the oil, gas, and other minerals and royalty now owned by the undersigned grantors in a producing oil well located on the SW 1/4 of the SW 1/4, less fifteen acres in the West side, Section 11, Township 6 North, Range 8 East, Lincoln County, Mississippi, which mineral and royalty interest was reserved by the undersigned grantors in a deed of even date herewith to Jewel Douglass [sic] and his wife, Ms. [sic] Hollis [sic] Douglass [sic].
The aforementioned property references are to the Well.
¶ 8. Jewel and Hollice conveyed their interest in the Land to the appellants in two separate conveyances dated May 27, 1977, and July 12, 1982. The deed conveying the surface rights of the Well was subject to prior mineral reservations. As a result, Connie Mack Douglas and Charlene T. Douglas (the Douglases) own the surface estate of the Land, but no mineral interest. However, the Douglases own minerals in other tracts in Section 11, and they have been paid working interest income by Denbury Onshore, LLC (Den-bury) in the approximate sum of $300,000 for production of the Well from the Compulsory Fieldwide Unit.
¶ 9. Production from the Well began in 1947. Chevron installed and cemented into the wellbore 10,549 feet of 7-inch production casing, 1,828 feet of 10 3/4-inch surface casing, and 212 feet of conductor pipe. The Well produced for a number of years, but on April 9, 1968, Chevron plugged the Well. When it plugged the Well, Chevron abandoned the conductor pipe, the surface casing, and the bottom 8,734 feet of production casing of the Well. Chevron cut the surface casing and conductor pipe below ground level, placed a cement plug on top, and covered the cemented wellbore with dirt. The Well lay dormant for almost forty years until late 2005, when Denbury began the reentry operations described below.
¶ 10. Beginning in 2001, Denbury obtained oil and gas leases from the mineral owners in the Land and other nearby lands, which became the East Mallalieu Field Unit. Some mineral owners did not sign oil and gas leases, but opted to participate in the operation as working interest owners.
¶ 11. On July 14, 2003, Denbury filed a petition with the Board and issued a public notice to form a Compulsory Fieldwide Unit (the Unit) for the East Mallalieu Field Unit. The Douglases own certain *916 mineral interests within other lands contained in the Unit. The Douglases received notice of the Board’s hearing to consider the petition and a- copy of the proposed Plan of Unitization (the Plan), but they failed to attend the hearing or file a contest or protest. On August 20, 2003, the Board considered Denbury’s petition and entered its order approving the Plan. The Douglases did not appeal that order.
¶ 12. Sometime in September 2003, Denbury filed a second petition seeking an order from the Board implementing the Unit. Proper notice was issued for this second Board hearing. Again, the Doug-lases failed to appear to contest or protest any provision of the Plan or implementation of the Plan. On October 29, 2003, the Board granted Denbury’s petition implementing the Unit. The Douglases did not appeal the Board’s order, and the Unit became effective November 1, 2003.
¶ 13. The Land is completely within the Unit’s boundaries and is subject to the Unit Agreement and Operating Agreement. The Douglases, as unleased mineral interest owners in the Unit, are working interest owners under the Plan and are subject to the terms and conditions of the Plan.
¶ 14. Beginning in April 2005, Denbury contacted the Douglases seeking permission to locate the Well since it was completely underground and covered in dirt. On April 26, 2005, Denbury submitted a proposed mineral lease and surface-use agreement to the Douglases; however, they declined to lease or execute the surface use agreement. The agreements contained language regarding the right to use plugged and abandoned wellbores, but the proposed lease did not purport to cover the tract in question.
¶ 15. The Douglases allege that the abandoned well chosen by Denbury is situated in their backyard near their residence, and Denbury’s use of the Well has disturbed the peaceful use of their private residential property. They further allege that Denbury could have chosen a different abandoned well, noting that there are several others around the area. Denbury claims the location in question best serves the geological location needed for a successful operation.
¶ 16. On November 23, 2005, Denbury obtained a permit from the Board to reenter the Well and complete it as an oil producer. The Douglases did not contest the issuance of the permit. The Well was completed as a producer shortly before January 31, 2006, Later, on April 19, 2007, the Board granted Denbury an amended permit to convert the Well to a C02 injection well. Denbury subsequently used the Well as a C02 injection well, and it remains in use today.
¶ 17. On March 12, 2009, the Douglases filed their complaint against Denbury Resources Inc., and John Does 1-100, claiming ownership of the Well and the equipment cemented therein. The Douglases later submitted an amended complaint substituting Denbury Onshore, LLC, as the proper party in interest. In their complaints, the Douglases alleged Denbury illegally entered the Well without the Doug-lases’ permission. They further alleged that Denbury wrongfully took property used from the Well’s site, and it improperly accessed the road and pipeline to the Well. The Douglases sought damages for the use of the Well, along with claims of nuisance and personal injury suffered as a result of Denbury’s operations.
¶ 18. There are no allegations, and the Douglases have presented no evidence that Denbury used more of the surface than was reasonably necessary to exercise its rights within the Unit. Further, the Doug-lases do not make any allegation that the *917 use of the property was used for an unreasonable purpose.
¶ 19. In February 2010, the Douglases filed a motion for summary judgment. Denbury also filed motions for summary judgment. On February 22, 2010, the chancery court denied the Douglases’ motion for summary judgment and granted both of Denbury’s motions for summary judgment regarding the Well’s use and surface damages. Finally, the chancery court dismissed -without prejudice the Douglases’ cause of action for nuisance. Aggrieved, the Douglases timely filed this appeal.
STANDARD OF REVIEW
¶ 20. This Court reviews a chancery court’s grant or denial of summary judgment under a de novo standard of review, viewing the evidence in the light most favorable to the nonmoving party. In re Estate of Thomas v. Wilson, 962 So.2d 141, 143 (¶ 9) (Miss.Ct.App.2007) (citation omitted). “If, in this view, there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law, summary judgment should forthwith be entered in his or her favor.” Id.
DISCUSSION
I. Use of the Abandoned Well
¶21. The Douglases argue that the chancery court erred by ruling that the surface owner of the land on and around the abandoned Well had no interest in the ownership or right to use this “improvement.” They argue that the Well became a fixture of the real property once Chevron abandoned it over thirty years ago. As such, the Well could no longer be considered as an access point to the mineral rights; at best, it was part of Chevron’s personal property, and Chevron never allowed Denbury to use that personal property. In the alternative, the Douglases maintain that even if the mineral rights apply to the Well, Denbury never acquired a lease for all parts of the unitized fields, only portions of the field, so Denbury does not have a right to access the Well.
¶22. The Douglases cite to an Oklahoma case, Garr-Woolley v. Martin, 579 P.2d 206, 208 (Okla.Civ.App.1978), as being persuasive authority on the issue. In Garr-Woolley, the Oklahoma Court of Civil Appeals held that “oil and gas equipment left on the landowner’s property for an unreasonable length of time after the termination of the lease will become the landowner’s property.” Id. at 209. Because Chevron abandoned the Well over thirty-four years ago, the Douglases maintain that the tubing and casing of the Well are now fixtures on the land. In support of this argument, the Douglases state that Chevron owned the Well and the equipment located within it. Chevron paid all of the costs of drilling and completing the Well; thus, Chevron, and not the mineral owners, was the exclusive owner of the Well and all improvements attached to it. Further, when Denbury acquired the oil and gas leases in Section 11, it acquired some, but not all, of the leases. The mineral owners did not assign or transfer the Well to Denbury, and no public records could be found that any other entity attempted to transfer the Well to Denbury.
¶ 23. We note from the outset that Mississippi generally follows Texas case law on oil and gas matters of first impression. Williamson v. Elf Aquitaine, Inc., 138 F.3d 546, 551 (5th Cir.1998) (citing Phillips Petroleum Co. v. Millette, 221 Miss. 1, 72 So.2d 176, 182 (1954)). In Mississippi, when land is severed to create a surface and mineral estate, the two estates are separate and distinct. Neal v. Teat, 240 Miss. 35, 43, 126 So.2d 124, 127 (1961). The owner of a mineral estate has *918 a corporeal possessory interest in the minerals. Lloyd’s Estate v. Mullen Tractor & Equip. Co., 192 Miss. 62, 64, 4 So.2d 282, 288 (1941). The mineral estate is dominant over the surface estate. Union Producing Co. v. Pittman, 245 Miss. 427, 433, 146 So.2d 553, 555 (1962); Jones v. Getty Oil Co., 458 S.W.2d 93, 95 (Texas 1970). As such, “a mineral owner or a lessee of the mineral estate, in the absence of additional rights expressly conveyed or reserved, may use as much of the surface as is reasonably necessary to exercise its right to recover minerals, without liability for surface damage.” EOG Res., Inc. v. Turner, 908 So.2d 848, 854 (¶ 18) (Miss.Ct. App.2005) (citing Union Prod. Co. v. Pittman, 245 Miss. 427, 433-34, 146 So.2d 553, 555 (1962)). Likewise, the mineral owner or mineral lessee has the absolute right to select the location for drilling a well. Id. (citation omitted).
¶ 24. In the present case, we find that the Well is part of the mineral estate. The wellbore and casing are clearly part of the subsurface; no part of the abandoned Well is above ground, and the Well can only be used for development of the mineral estate. The Well is a passageway or entrance to the mineral estate, and the Douglases admit that they have no use for the abandoned Well, nor can they extract it from the property. The Douglases also admit that they have no interest in the mineral rights on the property in question, although they do have some mineral interests in other tracts of land nearby.
¶ 25. Denbury was granted the right to access the Well per the Plan, which combined all of the land’s leases into a common lease. As a lessee to the mineral rights and Unit operator, Denbury had the right to enter the Douglases’ property and use the Well to gain access to the mineral estate. Id. Nothing in the record indicates that Denbury was unreasonable in its operations and use of the Douglases’ land.
¶ 26. We also note that once the well-bore and casing were abandoned years ago, the only option for further usage of the minerals was to re-enter the Well for the exploration and production of oil, gas and other minerals, or in this case, for a tertiary recovery effort. Therefore, we agree with the chancellor’s finding that the plugged and abandoned Well is part of the mineral estate, and as part of the mineral estate, the dominant estate owners have the right to use the Well to access the mineral estate. Accordingly, the Douglas-es’ argument is without merit.
II. Oil and Gas Board’s Authority to Grant Exclusive Use of the Abandoned Well to Denbury
¶ 27. The Douglases also argue that the chancery court erred by affirming the Board’s grant to Denbury of ownership and use of the abandoned wellbore, because the Board lacked the authority to do so. We disagree.
¶ 28. First, we find that the Douglases are procedurally barred from raising this issue on appeal. Section 53-3-119 of the Mississippi Code Annotated (Rev.2003), provides that interested parties aggrieved by the Board’s grant of a Plan of Unitization have thirty days from the date of the order to appeal the Board’s decision to the chancery court in the county where the land is located. The Board issued approval of Denbury’s Plan on September 17, 2003. The Douglases did not file their complaint against Denbury until March 12, 2009, well beyond the statutory limit. Therefore, the Douglases are procedurally barred from raising this issue now.
¶ 29. Notwithstanding the procedural bar, we will address the authority of the Board to grant such unitization plans. Section 53 — 1—17(3)(j) of the Mississippi *919 Code Annotated (Rev.2003) gives the Board the right to “regulate secondary recovery methods, including the introduction of gas, air, water or other substances into producing formations.” Further, the Board may approve a unit operation if the unitization plan “is reasonably necessary in order to effectively carry on secondary recovery ... calculated to substantially increase the ultimate recovery of oil and gas or both,” and is “fair and reasonable under all of the circumstances and protect the rights of all interested parties.” Miss. Code Ann. § 53-3-103(a), (c) (Rev.2003).
¶ 30. We note that Denbury properly followed each step required by the statute to have the Plan approved. The Douglas-es were notified of the Plan and failed to object. Moreover, the Douglases are working interest owners in the Unit from other tracts and have received over $300,000 in proceeds from those other tracts. The Douglases have failed to use the statutory remedies available to them. Thus, this issue is without merit.
III. Chancery Court’s Jurisdiction Over Nuisance and Personal Injury Claims
¶ 31. The Douglases argue that the chancery court erred by dismissing their claims of nuisance and personal injury against Denbury, and by stating that those claims should be brought in circuit court rather than chancery court. They claim that the chancery court properly had jurisdiction over the tort claims because the injuries and damages relate solely to the Well in question, and the chancery court should have extended pendent jurisdiction over the claims. The chancery court’s order does not address the Doug-lases’ claim for personal injury; however, the order does address the claims of nuisance. Thus, we will only discuss whether the order properly dismissed the nuisance claim.
¶ 32. We review a chancery court’s dismissal of an action under the substantial evidence/manifest error standard. Hearn, v. Autumn Woods Office Park Prop. Owners Ass’n, 757 So.2d 155, 163 (¶ 39) (Miss.1999) (citation omitted). This Court “will not disturb the factual findings of a chancellor when supported by substantial evidence unless ... the chancellor abused his discretion, was manifestly wrong, clearly erroneous or applied an erroneous legal standard.” A-1 Pallet Co. v. City of Jackson, 40 So.3d 563, 567 (¶ 11) (Miss.2010) (citations omitted). However, “jurisdiction is a question of law, which [is] reviewed de novo.” Derr Plantation, Inc. v. Swarek, 14 So.3d 711, 715 (¶ 8) (Miss.2009) (citations omitted).
¶ 33. A chancery court has “the discretion to award legal and even punitive damages as long as the chancery court’s jurisdiction has attached.” S. Leisure Homes, Inc. v. Hardin, 742 So.2d 1088, 1090 (¶ 6) (Miss.1999) (citation omitted). A court may properly exercise pendent jurisdiction if the claim “arisefe] out of the same transaction or occurrence as the principal claim or ... out of a common nucleus of operative fact.” McDonald’s Corp. v. Robinson Indus., Inc., 592 So.2d 927, 934 (Miss.1991) (citation omitted). If there is a doubt “as to whether a complaint is legal or equitable in nature, the better practice is to try the case in circuit court.” S. Leisure Homes, Inc., 742 So.2d at 1090 (¶6).
¶ 34. The Douglases’ original complaint stated the following:
Plaintiffs have been deprived of the customary and usual use of the property as cattle pasture and the location of the equipment is so close to the bedroom of their house that it has caused a distur *920 bance and nuisance, causing both Plaintiffs anxiety, depression, and stress from the omnipresent [sic] of the noise and commotion connected with the confiscated property and the operation of the injection well.
The Douglases prayed for relief in the form of actual and punitive damages. In its final order, the chancery court noted: “[T]he pleadings in this matter contain no allegation that Denbury used more of the surface than was reasonably necessary in its operations ... [and] no allegation that Denbury’s operations were conducted in a negligent manner.” The chancery court then went on to state that: if a nuisance claim did remain following the court’s grant of summary judgment in favor of Denbury, the Douglases must “bring that nuisance claim before a proper court of jurisdiction,” and a nuisance claim was not “a matter for the chancery court.”
¶ 35. The Douglases’ complaint shows that the remedy they seek in the form of actual and punitive damages is legal rather than equitable in nature. Thus, we find that the chancery court properly dismissed the nuisance claim without prejudice. Accordingly, this issue is without merit.
CONCLUSION
¶ 36. We find that the subsurface well-bore and its casing, which comprises the abandoned Well, is clearly a passageway to the mineral estate and can only be used to access and explore for minerals. Thus, the Well is part of the mineral estate. Den-bury, as mineral lessee and operator of the Unit, has the right to access and enter the surface land as is reasonably necessary to explore for and recover minerals. The Douglases are also proeedurally barred from raising a claim against the Board for granting Denbury’s Plan. Further, the chancery court did not err by dismissing the nuisance claim for lack of jurisdiction.
¶ 37. THE JUDGMENT OF THE LINCOLN COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., MYERS, BARNES, ROBERTS AND MAXWELL, JJ„ CONCUR. CARLTON, J., CONCURS IN RESULT ONLY. RUSSELL, J., NOT PARTICIPATING.

. Brewer assigned the Douglas Lease to California Corporation, which later became Chevron Corporation. We will refer to these entities simply as Chevron.

. This is the land that is the subject matter of the litigation and will be referred to as "the Land” hereinafter.