# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2017-CA-00138-SCT

*OLSHAN FOUNDATION REPAIR COMPANY OF
JACKSON, LLC d/b/a OLSHAN FOUNDATION
SOLUTIONS AND WAYNE BROWN*

*v.*

*GLORIA MOORE, PHILLIP R. MOORE AND
KATELYN A. MOORE*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/17/2017 |
| TRIAL JUDGE: | HON. JON MARK WEATHERS |
| TRIAL COURT ATTORNEYS: | ROBIN L. ROBERTS |
| | KATHLEEN INGRAM CARRINGTON |
| | RICHARD M. DYE |
| COURT FROM WHICH APPEALED: | PERRY COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | RICHARD M. DYE |
| | KATHLEEN INGRAM CARRINGTON |
| ATTORNEYS FOR APPELLEES: | ROBIN L. ROBERTS |
| | CHRISTOPHER D. NOBLES |
| | HEATHER E. MURRAY |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED - 06/28/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**KITCHENS, PRESIDING JUSTICE, FOR THE COURT:**

¶1.    Phillip Moore, Gloria Moore, and Katelyn Moore sued Olshan Foundation Repair of

Jackson, LLC (Olshan), and Wayne Brown in Perry County Circuit Court. Olshan and Brown

sought to compel arbitration pursuant to an arbitration provision within a contract between

Phillip Moore and Olshan for the repair of the foundation of the Moores' home. The circuit

court ordered Phillip and Gloria Moore to arbitrate their claims. But because the circuit court declined to order Katelyn Moore to the arbitral forum, Olshan and Brown now appeal. We affirm the judgment of the Perry County Circuit Court denying the motion to compel arbitration filed by Olshan and Brown as to Katelyn Moore's claims.

## FACTS AND PROCEDURAL HISTORY

¶2.     On June 10, 2013, Phillip Moore contracted[1] with Olshan for repairs to the foundation of the home he shared with his wife, Gloria Moore, and his adult daughter, Katelyn Moore. Phillip, Gloria, and Katelyn Moore sued Olshan and Brown in the Circuit Court of Perry County on April 29, 2016, requesting *contract* damages solely for Phillip Moore and Gloria Moore, including damages related to loss of value and expenses to repair their home.[2]

---

[1] The following arbitration provision appeared on the back page of the contract:

**ARBITRATION**: Contractor and Owner agree that any dispute or lawsuit arising out of this Agreement and Warranties shall be resolved by mandatory and binding arbitration pursuant to the arbitration laws in this state and in accordance with this agreement and the rules of the American Arbitration Association (AAA).  Parties may arbitrate with an agreed upon arbitrator.  If unable to agree, binding arbitration shall be administered by AAA.  All costs shall be divided equally among the parties.

[2] The Moores requested the following relief:

WHEREFORE, premises considered, as a result of the foregoing, damage was caused to the plaintiffs by the actions of Olshan. In particular, *Gloria and Phillip Moore have suffered the following damages*:

1.      Total and complete loss of the value of their home in the approximate amount of $200,000.00;
2.      Loss of use of their home during the time that the repairs were being undertaken;
3.      Loss of enjoyment of their home during the time that the damages were unrepaired;

Katelyn Moore alleged intentional or negligent infliction of emotional distress. The only remedy she sought is found in the unnumbered prayer for relief, separate and apart from the contract damages sought by Phillip Moore and Gloria Moore.

¶3. After Olshan and Brown moved to compel arbitration, the circuit court held a hearing. It then entered an order granting the motion with respect to Phillip and Gloria Moore's claims while denying the motion as it pertains to Katelyn Moore's claims. Regarding Katelyn Moore's claims, the circuit court reasoned that the terms of the contract were not broad enough to include Katelyn as a third-party beneficiary of the agreement and that the arbitration agreement could not be enforced against Katelyn on the grounds of estoppel "as her claims are not based solely on the terms of the contract." The circuit court explained:

> Katelyn asserts claims for intentional or negligent infliction of emotional distress and negligence which could be pursued regardless of whether or not

4.   Expenses having the house repaired;
5.   Expenses having the house examined to determine what actions could be taken to salvage the value of the home;
6.   Medical bills for Phillip Moore to deal with his ulcerative colitis issues;
7.   Attorneys fees in attempting to have the house repaired;
8.   Other consequential damages such as interest on their loan.

> The Moores demand payment (1) for the full value of their home ($200,000.00), (2) for loss of use of their home in the amount of the rental value for (3) years ($36,000.00), (3) medical bills and emotional stress damages ($250,000.00) for Phillip Moore *and $100,000.00 for Katelyn Moore*, (4) actual and punitive damages for fraud in the amount of $100,000.00, (5) all attorneys fees, expenses, pre-judgment interest, and (6) punitive damages as may be allowed by law for the willful and wanton conduct of Olshan.

(Emphasis added.)

there was a contract. Moreover, due to ambiguity in the Complaint, it is not clear to the [c]ourt if Katelyn is seeking to assert claims for breach of contract and breach of warranty. Those claims more properly belong to Phillip and Gloria.

The trial court further held that Katelyn Moore was neither a third-party beneficiary nor a direct beneficiary of the Olshan contract, because:

> the terms of the contract were not expressly broad enough to include Katelyn as a third-party by name or as one of a specified class, as Katelyn was not an owner of the property. Furthermore, Katelyn was not a direct beneficiary of the contract. The fact that Katelyn resides in the home makes her an incidental, not direct beneficiary of the construction work performed by Olshan. *See Rein v. Benchmark Construction Company*, 865 So. 2d 1134 (Miss. 2004); *Simmons Housing Inc. v. Shelton ex rel. Shelton*, 36 So. 2d 1283 (Miss. 2010).

¶4.     Olshan and Brown appeal only the circuit court's denial of their motion to compel Katelyn Moore to arbitrate her claims.

## ANALYSIS

¶5.     A grant or denial of a motion to compel arbitration is reviewed *de novo*. *Harrison Cty. Commercial Lot, LLC v. H. Gordon Myrick, Inc.*, 107 So. 3d 943, 949 (Miss. 2013) (citing *Cmty. Bank of Miss. v. Stuckey*, 52 So. 3d 1179, 1181 (Miss. 2010)).

¶6.     The circuit court held that the arbitration provision in the foundation-repair contract between Phillip Moore and Olshan was valid and enforceable and that Gloria Moore was a third-party beneficiary. Phillip and Gloria Moore declined to cross-appeal the circuit court's decision that the arbitration agreement was valid and enforceable respecting their claims. Accordingly, the validity of the arbitration provision, itself, is not before the Court. The only question is whether Katelyn Moore, a nonsignatory, is bound to arbitrate her claims against Olshan.

4

¶7.    Olshan contends that a federal policy favoring arbitration exists and the Federal Arbitration Act (FAA) requires "that 'we rigorously enforce agreements to arbitrate.'" *East Ford, Inc. v. Taylor*, 826 So. 2d 709, 713 (Miss. 2002) (quoting *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 226, 107 S. Ct. 2332, 2337, 96 L. Ed. 2d 185 (1987)). But Phillip Moore contracted specifically with Olshan for Mississippi law to govern any disputes or lawsuits arising out of their agreement. So the FAA does not apply to this case. And Mississippi courts will "not override the clear intent of the parties, or reach a result inconsistent with the plain text of the contract, simply because the policy favoring arbitration is implicated." *B.C. Rogers Poultry Inc. v. Wedgeworth*, 911 So. 2d 483, 487 (Miss. 2005) (quoting *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294, 122 S. Ct. 754, 764, 151 L. Ed. 2d 755 (2002)).

¶8.    Only in the rarest of circumstances, and with caution, should we shackle a citizen to an agreement of others that strips the citizen of his or her constitutional right to a trial by jury. Miss. Const. Art. 3, § 31; *see Pinnacle Trust Co., L.L.C. v. McTaggart*, 152 So. 3d 1123, 1127 (quoting *Scruggs v. Wyatt*, 60 So. 3d 758, 767 (Miss. 2011) (quoting *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F. 3d 347, 354 n.3 (5th Cir. 2003))) ("arbitration agreements apply to nonsignatories only 'in rare circumstances.'"). This Court has held that "[a] nonsignatory may be bound to an arbitration agreement under ordinary principles of contract and agency." *Simmons Housing, Inc. v. Shelton ex rel. Shelton*, 36 So. 3d 1283, 1286 (Miss. 2010) (internal citations omitted). "[A] signatory may enforce an arbitration

agreement against a non-signatory if the non-signatory is a third-party beneficiary or if the doctrine of equitable estoppel applies." *Id.* (internal quotations omitted).

¶9.    *Simmons* was introduced to these proceedings by Olshan in its motion to compel arbitration, albeit for a different proposition.[3] Roy and Kimberly Shelton and their two minor children brought suit against Simmons Housing, Inc., *et al.*, for claims concerning a defective mobile home. *Simmons*, 36 So. 3d at 1285. The circuit court compelled the parents' claims to arbitration based on two agreements they had signed in purchasing the mobile home, but refused to compel the children's claims to arbitration. *Id.* at 1285-86. This Court held that the nonsignatory children could not be bound to arbitration because they were neither third-party beneficiaries, nor were they bound to the contract by virtue of direct-benefit estoppel. *Id.* at 1286-88.

¶10.    First, the *Simmons* Court analyzed whether the Sheltons' children were third-party beneficiaries and held that a person may be considered a third-party beneficiary "if: (1) the contract between the original parties was entered for that person's or entity's benefit, or the original parties at least contemplated such benefit as a direct result of performance; (2) the promisee owed a legal obligation or duty to that person or entity; and (3) the legal obligation or duty connects that person or entity with the contract." *Id.* at 1286 (citing *Burns v. Washington Savings*, 251 Miss. 789, 796, 171 So. 2d 322, 325 (1965)).[4] *Simmons* held that

---

[3] Instead of distinguishing *Simmons*—a factually analogous case—Olshan cites a Texas intermediate appellate court opinion that applies the FAA. *In re Ford Motor Co.*, 220 S.W.3d 22 (Tex. App. 2006).

[4] The *Simmons* Court's third-party-beneficiary analysis was based on *Yazoo & M.V.R. Co. v. Sideboard*, 161 Miss. 4, 133 So. 669 (1931). In *Sideboard*, a railroad labor

"a mere incidental or consequential benefit is insufficient." *Id.* at 1287 (quoting *Adams v. Greenpoint Credit, LLC*, 943 So. 2d at 703, 708 (Miss. 2006) (daughter was not bound by arbitration clause found in the contract signed by her father)). Accordingly, this Court held that the Sheltons' children were not third-party beneficiaries to the agreements signed by their parents, because the children "were not referenced or alluded to in the contract. Additionally, their living in the mobile home did not make them direct beneficiaries."

---

union composed exclusively of white men entered into a union compensation agreement, which provided that the rights contained in the agreement would apply for both white and African-American employees alike. *Id.* at 670. On February 27, 1925, the railroad, having conceived at that time the idea that, because Sideboard was not, and could not be, a member of the union, he could not enforce any rights under the union contract. *Id.* Sideboard was notified that on and after March 16, 1925, he would no longer be paid wages for the job he was performing, but rather would be paid lesser wages for a different job. *Id.* Sideboard continued working, and checks were sent to him regularly at the new, lower rate, stipulating that he was paid in full for services rendered. *Id.* Sideboard accepted and cashed the checks from March 16, 1925, to March 1, 1927, during all of which time Sideboard was appealing for recognition of his right to equal pay, by letter and by personal interviews from officer to officer of the railroad company, by successive steps finally to the president of the entire railroad system based in Chicago, Illinois. The appeals were met with consistent and persistent refusal, and finally, when he saw that there was no possibility of any change of attitude on the part of the railroad, Sideboard declined to accept or cash any further pay checks on and after March 1, 1927, and went without accepting or cashing the paychecks for an additional year, until the railroad discharged Sideboard from service. *Id.* Sideboard prevailed in a jury trial in Warren County. This Court affirmed the trial court's judgment that Sideboard was a third-party beneficiary to the union contract and entitled to enforce rights under the contract, reasoning that:

> (1) When the terms of the contract are expressly broad enough to include the third party either by name as one of a specified class, and (2) the said third party was evidently within the intent of the terms so used, the said third party will be within its benefits, if (3) the promisee had, in fact, a substantial and articulate interest in the welfare of the said third party in respect to the subject of the contract.

*Id.* at 671.

*Simmons*, 36 So. 3d at 1287. Here, as in *Simmons*, Katelyn Moore was not mentioned in the contract. She merely lived in the home. *Simmons* held that living under the same roof was insufficient to confer third-party-beneficiary or direct-beneficiary status.

¶11.    Here, the trial judge eminently was correct in finding that Katelyn Moore was neither a third-party beneficiary nor a direct beneficiary because:

> the terms of the contract were not expressly broad enough to include Katelyn as a third-party by name or as one of a specified class, as Katelyn was not an owner of the property. Furthermore, Katelyn was not a direct beneficiary of the contract. The fact that Katelyn resides in the home makes her an incidental, not direct beneficiary of the construction work performed by Olshan. *See Rein v. Benchmark Construction Company*, 865 So. 2d 1134 (Miss. 2004); *Simmons Housing Inc. v. Shelton ex rel. Shelton*, 36 So. 2d 1283 (Miss. 2010).

¶12.    The *Simmons* Court next analyzed whether equitable estoppel would bind the Sheltons' children to arbitration. *Simmons*, 36 So. 3d at 1287. Equitable estoppel "is an extraordinary remedy to be used with caution." *Adams*, 943 So. 2d at 709. "In the arbitration context, equitable estoppel prevents a party from embracing the benefits of a contract while simultaneously trying to avoid its burdens." *Simmons*, 36 So. 3d at 1287.

¶13.    Olshan unconvincingly argues that equitable estoppel applies because Katelyn Moore's claim of personal injury arises from the contract, so she should be bound to arbitrate. Katelyn Moore argues that she is not subject to equitable estoppel because she had no knowledge of the contract, and, therefore, she could not have benefitted knowingly from the contract. She continues that her claim for negligent and intentional infliction of emotional distress is not dependent on the contract. We agree. In *Hattiesburg Health & Rehab Center, LLC v. Brown*, 176 So. 3d 17, 18 (Miss. 2015), a nursing home resident's wife, who had

8

signed an admission agreement that contained an arbitration provision, filed a wrongful death lawsuit against the nursing home after her husband's death. The circuit court denied the nursing home's motion to compel arbitration, and this Court affirmed. *Id.* at 18, 25. On appeal, the nursing home argued that the decedent had been estopped from repudiating "the terms of the admission agreement because he received services from [the nursing home] and benefitted from the terms of the agreement." *Id.* at 23-24. This Court held that the husband's estate "is not attempting to 'enforce the terms' of the admission agreement, nor is it 'asserting claims that must be determined by reference to it.'" *Id.* at 24. The wife had "alleged claims of negligence, medical malpractice, . . . deviations from the standard of care, *respondeat superior*, *res ipsa loquitur*, negligent supervision and retention and wrongful death." *Id.* at 19. With regard to the wife's claims, this Court observed: "[s]imply put, Leo's estate's claims sound in tort and [the wife] could pursue those claims without an admission agreement at all." *Id.* Here, too, Katelyn's claims sound in tort. Katelyn neither sought enforcement of the contract nor did she assert a prayer for relief in her complaint compelling performance of the contract.[5]

¶14.     The trial court correctly found that Katelyn Moore's claim for intentional or negligent infliction of emotional distress and negligence "could be pursued regardless of whether or not there was a contract."

---

[5] "A pleading which sets forth a claim for relief, whether an original claim, counterclaim, cross-claim, or third-party claim, shall contain (1) a short and plain statement of the claim showing that the pleader is entitled to relief, and, (2) *a demand for judgment for the relief to which he deems himself entitled*.  Relief in the alternative or of several different types may be demanded."  Miss. R. Civ. P. 8 (emphasis added).

9

¶15. Olshan next argues that direct-benefit estoppel mandates enforcement of an arbitration provision against a nonsignatory. "Direct-benefit estoppel involves non-signatories who, during the life of the contract, have embraced the contract despite their non-signatory status, but then, during litigation, attempt to repudiate the arbitration clause in the contract." *Pinnacle Trust Co.*, 152 So. 3d at 1124 (quoting *Noble Drilling Servs., Inc. v. Certex USA, Inc.*, 620 F. 3d 469, 473 (5th Cir. 2010)). In order for direct-benefit estoppel to apply, a nonsignatory must "'embrace' a contract containing an arbitration clause" in one of two ways. *Scruggs*, 60 So. 3d at 760. First, a nonsignatory can embrace a contract "by knowingly seeking and obtaining 'direct benefits' from that contract." *Id.* Katelyn Moore did not. Or, a nonsignatory can embrace a contract "by seeking to enforce the terms of that contract or asserting claims that must be determined by reference to that contract." *Id.* Katelyn Moore did not. In *Pinnacle Trust Co.*, nonsignatory trustees were not bound to an arbitration agreement under direct-benefit estoppel because they were neither beneficiaries, direct or residual, nor were they aware of the agreement that would bind them to arbitrate their claims. *Pinnacle Trust Co.*, 152 So. 3d at 1129. Neither was Katelyn Moore.

¶16. Katelyn Moore is not a direct beneficiary because she never sought to obtain any direct benefit from the foundation-repair contract. She is, as the trial court ruled, merely an incidental beneficiary. *Simmons*, 36 So. 3d at 1287. Katelyn Moore is not asserting a claim that requires reference to the contract, and no evidence has been offered to support the argument that Katelyn knowingly sought any direct benefit from the contract or that she

embraced its terms. Moreover, no evidence has been offered that Katelyn Moore knew of the contract's existence, much less that it contained an arbitration provision.

¶17. In any event, Katelyn Moore "cannot be required to arbitrate any disputes [to] which [she] did not agree . . . ." ***Harrison Cty. Commercial Lot, LLC***, 107 So. 3d at 949 (citing ***Scruggs***, 60 So. 3d at 767). In reviewing the contract, there is no evidence of the following: (1) that the contract between Olshan and Phillip Moore was intended for Katelyn Moore's benefit; (2) that Olshan and Phillip Moore at least contemplated such benefit to Katelyn Moore as a direct result of performance; (3) that Olshan owed a contractual obligation or duty to Katelyn Moore, or *vice versa*; (4) that the terms of the contract were expressly broad enough to include Katelyn Moore either by name or by specified class; (4) that Katelyn Moore evidently was within the intent of the terms of the contract, and that Katelyn Moore would be within its benefits; (5) that Olshan had a substantial and articulate interest in the welfare of Katelyn Moore in respect to the subject of the contract; (6) that the contract references or alludes to Katelyn Moore; (7) that Katelyn Moore signed the contract; or (8) that Katelyn Moore consistently has maintained that other provisions of the same contract should be enforced to benefit her. ***Simmons***, 36 So. 3d at 1286-88.

¶18. Importantly, in ***Simmons***, the children alleged contract-related claims. ***Simmons***, 36 So. 3d at 1288. The children did not seek to amend their complaint or to withdraw it to strike the contract-related claims. ***Id.*** Nevertheless, this Court remanded the case to proceed on the tort claims but declared the contract-related claims to have been relinquished. ***Id.*** at 1289.

11

Here, Katelyn Moore did not assert a claim based on the contract because she does not request relief for damages under the contract.

¶19. Finally, Olshan cites *Terminix International, Inc. v. Rice*, 904 So. 2d 1051 (Miss. 2004). In *Rice*,"a husband and wife sued Terminix for negligence, misrepresentation, fraud, breach of contract, and fraudulent inducement." *Simmons*, 36 So. 3d at 1288 (citing *Rice*, 904 So. 2d at 1058). This Court had held that "the wife was bound to the arbitration agreement under the ordinary principles of equitable estoppel." *Id.* (citing *Rice*, 904 So. 2d at 1058). Olshan argues that Katelyn Moore's claims, "whether sounding in negligence or contract, all directly stem from Olshan's alleged failure to properly perform the foundation repair work covered by the Agreement." But in *Simmons*, this Court observed that the *Rice* Court, which had referenced the wife's claims in passing, "gave very little discussion as to why equitable estoppel applied to the facts of that case," and, according to a footnote, "afforded great weight to the fact that the wife's suit relied exclusively on the contract." *Id.* (citing *Rice*, 904 So. 2d at 1057-58 n.3).

¶20. As in *Simmons* and *Brown*, Katelyn Moore is neither a third-party beneficiary to the foundation-repair contract nor is she bound by direct-benefit estoppel. Accordingly, we hold that Katelyn Moore's claims, including negligence and intentional/negligent infliction of emotional distress, are wholly independent of the terms of the contract to which she was not a party. We hold further that Olshan should not be allowed to enforce an arbitration clause respecting Katelyn Moore's claims, which are unrelated to the contract.

12

**CONCLUSION**

¶21.	On *de novo* review, we find that the circuit court did not err in declining to compel Katelyn Moore's claims to arbitration. Accordingly, we affirm the judgment of the Perry County Circuit Court.

¶22.	**AFFIRMED.**

**WALLER, C.J., RANDOLPH, P.J., KING, COLEMAN AND BEAM, JJ., CONCUR. CHAMBERLIN, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY MAXWELL AND ISHEE, JJ.**

**CHAMBERLIN, JUSTICE, DISSENTING:**

¶23.	We should not expand the right to arbitration but rather apply already-established law. However, as all of the claims alleged against Olshan and Brown arose from the contract and Katelyn availed herself of that contract, acts already contemplated under existing law, I respectfully dissent. I would reverse the circuit court's denial of arbitration and remand the case to be compelled to arbitration in its entirety.

¶24.	As the majority recognizes, a party is bound by the principles of direct-benefit estoppel where the party "seek[s] to enforce the terms of that contract or assert[s] claims that must be determined by reference to that contract." *Scruggs v. Wyatt*, 60 So. 3d 758, 760 (Miss. 2011); *see also Noble Drilling Servs., Inc. v. Certex USA, Inc.*, 620 F.3d 469, 473 (5th Cir. 2010).

¶25.	Despite the majority's insistence otherwise, Katelyn (herself or, in the alternative, through her mother as her next friend and natural guardian) has asserted claims that must be determined by reference to the contract. Under the complaint, Katelyn brought all five

counts against Olshan and Brown. While the majority is quick to note the clear intent of the parties concerning the application of Mississippi law, it wholly ignores the Moores' admission on appeal that Katelyn brought all five counts in the complaint. On appeal, the Moores (including Katelyn) bluntly declare:

> Katelyn, along with her parents Phillip and Gloria Moore, sued Olshan and Wayne Brown, as the employee and GM of Olshan, in Perry County Circuit Court for breach of contract, breach of warranty, negligence, fraud, and Intentional/Negligent Infliction of Emotional Distress (INIED) claims stemming from Olshan's failure to competently repair their foundation.

This admission is nothing new, though, as the Moores (including Katelyn), in their response to the motion to compel, argued that "[b]ecause the Moores' claims all *arise out of the same occurrence*, the claims should be resolved together, either through arbitration or trial." (Emphasis added.)

¶26. Instead of deferring to the language of the complaint and the Moores' claims, the majority is forced to draw the distinction that Katelyn has brought only count five against Olshan and Brown. This distinction is unsupported by the complaint and the entire record both in the circuit court and on appeal. The majority's attempt to justify its interpretation of the complaint by recognizing that Katelyn's damages were alleged separately is unavailing in light of the language of the complaint paired with the Moores' own understanding of the claims brought. Even if the circuit court was correct to interpret the complaint's use of the term "the Moores" as excluding Katelyn, Katelyn's continued insistence on appeal that she brought the claims alongside her parents renders this interpretation on appeal untenable.

14

¶27.   Had Katelyn brought only count five, though, her claim still should be arbitrated.  As to count five, the complaint's specific reference to Katelyn does not allege a cause of action against Olshan or Brown without the surrounding context of the breach-of-contract claims.  As to Katelyn, count five states "Katelyn Moore has autism and other mental complications which cause emotional distress due to limited coping skills with physical manifestations of migraine headaches."  Alone, these allegations do not allege any cause of action against Olshan and Brown.  Instead, the allegations claim that Katelyn's autism and other mental complications caused her emotional distress.  These are, at best, damages.  Only when the allegations are read in conjunction with the first phrase of Phillip's claim does Katelyn's claim become actionable.  The first phrase of Phillip's claim in count five provides: "Due to the actions of Olshan, as previously described in the statement of facts, and its negligence and breach of contract. . . ."

¶28.   The majority's reliance on *Simmons* and *Brown* is misplaced: in both those cases the Court declined to apply equitable estoppel, as the parties at issue were not bringing contact claims.  *Simmons Housing, Inc. v. Shelton ex rel. Shelton*, 36 So. 3d at 1283, 1288 (Miss. 2010); *Hattiesburg Health & Rehab Center, LLC v. Brown*, 176 So. 3d 17, 24 (Miss. 2015).  In *Simmons*, the Court recognized that the children "insist that they do not—and cannot—seek recovery for breach of contract." *Simmons*, 36 So. 3d at 1288.  Likewise, in *Brown*, the Court found that the estate's claims sounded in tort without reference to the contract. *Brown*, 176 So. 3d at 24.  Instead, here, the Moores insisted at the circuit court and

15

now continue to insist on appeal that Katelyn brought the five counts in the complaint against Olshan and Brown.

¶29.    Katelyn's claims against Olshan and Brown arose from the contract at issue in this case.  Katelyn brought suit against Olshan and Brown under that contract, alleging claims that must, by the Moore's own admissions, be resolved by reference to that contract.  As such, I would apply established law and compel Katelyn's claims to arbitration.

**MAXWELL AND ISHEE, JJ., JOIN THIS OPINION.**