# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

March 25, 2020

Lyle W. Cayce
Clerk

No. 19-60151

PETRO HARVESTER OPERATING COMPANY, L.L.C.; PETRO
HARVESTER LAUREL HOLDINGS, L.L.C.,

      Plaintiffs - Appellees

v.

DAVID KEITH; TERRY KEITH,

      Defendants - Appellants

Appeal from the United States District Court
for the Southern District of Mississippi

Before WIENER, HIGGINSON, and HO, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:

Appellants David and Terry Keith (the "Keiths") own the surface of 4.3 acres of land sitting atop the property leased by Appellee Petro Harvester Operating Company ("Petro Harvester").[1] Petro Harvester's distant predecessors-in-interest began leasing the Keiths' surface land in 1988 and Petro Harvester continued to do so until 2018. When the lease expired, Petro Harvester sought a declaratory judgment that it could continue to operate its

---

[1] Appellee consists of Petro Harvester Laurel Holdings, LLC and Petro Harvester Operating Company, LLC. Petro Harvester Laurel Holdings, LLC consists of Petro Harvester Oil and Gas, Inc. Petro Harvester Operating Company, LLC consists of Petro Harvester Oil and Gas, Inc. and Petro Harvester Intermediary, Inc.

No. 19-60151

oil and gas extraction activities on the Keiths' surface land even without a surface lease, pointing to its explicit and implicit surface rights as a mineral lessee. The Keiths responded that the Surface Lease required Petro Harvester to return the surface land to its pre-lease condition upon expiration, meaning Petro Harvester was required to remove its machinery and vacate the property. The district court granted summary judgment in favor of Petro Harvester. The Keiths now appeal. For the reasons set forth below, we affirm the district court's summary judgment order.

## I.

## A.

On June 7, 1985, the Keiths purchased the surface of approximately 4.3 acres of land in Mississippi for $1,850. Before the Keiths bought the property, the surface rights and mineral rights had been severed. Therefore, the Keiths do not own the mineral rights; they only own rights to the surface.

Under a 1959 mineral lease (the "Mineral Lease"), Petro Harvester's predecessors-in-interest began leasing the mineral estate underlying the Keiths' surface property. In 2010, Petro Harvester was assigned the rights under the Mineral Lease and became the mineral lessee and operator. The Mineral Lease grants Petro Harvester the right to conduct oil and gas operations on the Keiths' property. Specifically, the Mineral Lease gives Petro Harvester the following rights:

> [T]he exclusive right of exploring, drilling, mining, and operating for, producing, and owning oil, gas Sulphur and all other minerals . . . together with the right to make surveys on said land, lay pipe lines, establish and utilize facilities for surface or subsurface disposal of salt water, construct roads and bridges, dig canals, build tanks, power stations, power lines, telephone lines, employee houses and other structures on said land, necessary or useful in lessee's operations in exploring, drilling for, producing, treating, storying and transporting minerals produced from the land covered hereby or any other lands adjacent thereto.

2

No. 19-60151

Petro Harvester also leased the Keiths' surface land from 2010 to 2018 under a 1988 surface lease (the "Surface Lease") executed by Petro Harvester's predecessors-in-interest. The Mineral Lease predates the Surface Lease by almost 30 years. The Surface Lease makes no reference to the preexisting Mineral Lease.

Petro Harvester operates the Laurel Oil Field, which is a large oil field that includes the Keiths' surface land and hundreds of additional acres. The Keiths' 4.3-acre plot is among over 1,000 acres of surface lands that Petro Harvester can access to produce oil and gas. Petro Harvester's operations on the surface of the Keiths' property include the operation of six wells, three pumps, buried flowlines and piping, and an electric power panel. When the Surface Lease was signed in 1988, the only structure on the property was a wooden building. The wooden structure was destroyed by another operator sometime between 1999 and 2002.[2]

**B.**

Section 8 of the Surface Lease contains the following key provision:

> 8. Tenant agrees at the end of the lease term that it shall return the premises to Landlord in the same or similar condition as the property was in at the commencement hereof except for normal wear.

The Surface Lease gives Petro Harvester the right to use the property for "any lawful purpose" and the right to restrict the amount of debt the Keiths owed on the property.

The Surface Lease expired on March 25, 2018. When the Surface Lease expired, Petro Harvester did not remove its equipment from the Keiths'

---

[2] The Keiths do not allege any breach of contract arising from demolition of the wooden structure. The Keiths only seek the removal of wells and pumps that have been installed on the surface of the property since the Surface Lease was first executed in 1988.

No. 19-60151

property. The parties agree that Petro Harvester has complied with all other terms of the Surface Lease.

## C.

Petro Harvester filed this action seeking a declaratory judgment that, despite the expiration of the Surface Lease, it has the right to use the property's surface to conduct its oil and gas operations, and that its current use is reasonable for this purpose. The Keiths responded by filing a counterclaim alleging that Petro Harvester breached the Surface Lease by failing to return the property to its pre-Surface Lease condition. The Keiths also asserted counterclaims for breach of contract, tortious breach of contract, and breach of the implied duty of good faith and fair dealing. The Keiths sought specific performance of the Surface Lease, eviction of Petro Harvester, and damages. The Keiths also asserted various affirmative defenses, including waiver, ratification, estoppel, and the statute of limitations. The parties filed cross-motions for summary judgment. In their summary judgment briefing, neither party contended that there were material factual disputes. Instead, the parties' disagreements were legal. The district court granted summary judgment in favor of Petro Harvester and denied the Keiths' summary judgment motion. The district court held that Petro Harvester's surface rights as the mineral lessee could not be superseded through the Surface Lease, relying on *Reynolds v. Amerada Hess Corp.*, 778 So. 2d 759 (Miss. 2000).

## II.

This court has appellate jurisdiction under 28 U.S.C. § 1291 because the Keiths timely appealed a final judgment. This court has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds

No. 19-60151

$75,000.

The parties and the district court agree that Mississippi law applies. *See Kountouris v. Varvaris*, 476 So. 2d 599, 606 (Miss. 1985); *Tideway Oil Programs, Inc. v. Serio*, 431 So. 2d 454, 458 (Miss. 1983); *Spragins v. Louise Plantation, Inc.*, 391 So. 2d 97, 100 (Miss. 1980); *see also* Restatement (Second) of Conflict of Laws §§ 223–24 (Am. Law Inst. 1971). When determining Mississippi law, this court first looks to "the final decisions of the [Mississippi] Supreme Court." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 206 (5th Cir. 2007). If these decisions provide inadequate guidance, this court must make an *Erie* guess and determine "how [the Mississippi Supreme Court] would resolve the issue if presented with the same case." *Id.*

"This court reviews a district court's grant of summary judgment de novo, applying the same legal standards as the district court." *Tradewinds Envtl. Restoration, Inc. v. St. Tammany Park, LLC*, 578 F.3d 255, 258 (5th Cir. 2009) (quoting *Condrey v. SunTrust Bank of Ga.*, 429 F.3d 556, 562 (5th Cir. 2005)). "Summary judgment is appropriate when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *United States v. Nature's Way Marine, L.L.C.*, 904 F.3d 416, 419 (5th Cir. 2018) (quoting FED. R. CIV. P. 56(a)).

## III.

The Keiths contend that the district court erred by rejecting their breach of contract claim and each of their affirmative defenses. We find no error in the district court's holding and therefore affirm. The district court correctly held that the Surface Lease here does not supersede the Mineral Lease. The district court also properly rejected the Keiths' affirmative defenses of waiver, ratification, and estoppel. Mississippi's statute of limitations does not bar Petro Harvester's declaratory judgment action. Finally, the Keiths waived any

No. 19-60151

argument that there are genuine issues of material fact that preclude summary judgment.

**A.**

Under the Mineral Lease, Petro Harvester is given authority to use the surface for its oil and gas operations. And Mississippi common law provides that mineral lessees have "the right to use the surface of the lands for all reasonable purposes to explore and drill for oil and gas and may use as much of the surface as is reasonably necessary to exercise [their] rights." *Reynolds*, 778 So. 2d at 762. Under the Surface Lease, Petro Harvester is required to return the property to its pre-Surface Lease condition, which could be interpreted to require Petro Harvester to remove the wells, pipelines, and pumps that have been installed on the surface to assist with extraction efforts since the Surface Lease was executed in 1988. The primary issue before us is whether the Surface Lease limits or restricts Petro Harvester's rights under the Mineral Lease and under Mississippi mineral rights law.

The district court held in favor of Petro Harvester, concluding that the outcome of the case was largely controlled by the Mississippi Supreme Court's holding in *Reynolds*. The Keiths attempt to distinguish *Reynolds* and criticize the district court opinion as overly broad because it impinges on the right to contract freely. Petro Harvester responds by relying on *Reynolds* for the proposition that the Surface Lease does not supersede the dominant mineral estate.

We affirm the district court and hold, consistent with *Reynolds*, that the Surface Lease here, as written, did not supersede Petro Harvester's explicit and implicit surface rights as a mineral lessee after expiration of the Surface Lease.

6

No. 19-60151

**i.**

*Reynolds* controls the result here. In that case, the mineral owner leased the mineral rights of the Eucutta Oil Field to Humble Oil Company in 1940. 778 So. 2d at 760. The mineral lease gave Humble rights equivalent to those acquired by Petro Harvester under its mineral lease.[3] *Id.* Reynolds later bought part of the surface land. *Id.* Trans-State Oil Company was eventually designated the operator of the oil-producing units used to extract oil from Humble's leased property—with permission from Humble and the owner of the mineral estate. *Id.*

In 1968, long after the mineral lease was in existence, Trans-State began leasing part of Reynolds' surface property. *Id.* Under the surface lease, Trans-State was authorized to construct exploration equipment on the Reynolds' surface property but had to remove all equipment from the property within 90 days following termination. *Id.* at 760–61. The lease expired in 1988. *Id.* By then, Trans-State had become Amerada Hess Corporation ("Hess").[4] *Id.* When the lease expired, Reynolds shut down the oil facilities on the surface of his property, claiming that Hess no longer had the right to use the surface of his property because the surface lease had expired. *Id.*

Hess moved for a preliminary injunction prohibiting Reynolds from interfering with its operations, which the trial court granted. *Id.* Reynolds

---

[3] The mineral lease granted Humble:

[T]he right of operating for and producing therefrom oil, gas and/or other minerals, casinghead gas and casinghead gasoline, with right of way and easements for pipelines, telegraph and telephone lines, tanks, power houses, stations, gasoline plants and fixtures for producing, treating and caring for such products and any and all rights and privileges necessary, incident to or convenient for the economical operations of said land for oil, gas and/or other minerals, casinghead gas and casinghead gasoline.

*Reynolds*, 778 So. 2d at 760.

[4] From this point forward, Trans-State is referred to as Hess because Hess was the relevant party when the dispute arose.

counterclaimed, alleging breach of contract. *Id.* The trial court granted summary judgment in favor of Hess. *Id.* On appeal, Reynolds argued that Hess contracted away certain surface rights granted to Humble under the 1940 mineral lease when it entered into the 1968 surface lease. *Id.* at 762. Hess responded that, as the operator, it did not have the authority to bargain away the surface rights belonging to the mineral lessee (Humble). *Id.*

The Supreme Court of Mississippi began by emphasizing that Hess was granted surface rights co-extensive with those granted to Humble under the 1940 mineral lease, along with rights implied to mineral lessees under Mississippi common law. *Id.* at 762. The court went on to note that other courts had rejected Reynolds' argument: "The Reynoldses' assertion that the surface lease supersedes the existing mineral lease has been rejected time and again in other jurisdictions." *Id.* (citing *Mingo Oil Producers v. Kamp Cattle Co.*, 776 P.2d 736, 740 (Wyo. 1989); *Livingston v. Indian Territory Illuminating Oil Co.*, 91 F.2d 833 (10th Cir. 1937); *Ball v. Dillard*, 602 S.W.2d 521 (Tex. 1980)). The court then held that Reynolds' "surface lease did not supersede the 1940 mineral lease." *Id.* at 764. Therefore, Hess was entitled to leave its operating equipment on Reynolds' property. Like the operator in *Reynolds*, Petro Harvester became party to the Surface Lease purporting to limit or restrict its rights under the Mineral Lease.

The Keiths argue, however, that *Reynolds* is distinguishable. The Keiths emphasize that the operator in *Reynolds* was a separate entity from the mineral lessee. Because the entities were separate, the operator signed the surface lease but the mineral lessee did not, meaning the mineral lessee could not be bound by it. Here, however, the operator and the mineral lessee are the same entity—and this was true at the time the Surface Lease was signed as well—meaning that the Surface Lease binds the mineral lessee and all successors-in-interest, including Petro Harvester. The Keiths contend that this

No. 19-60151

fact materially impacts the applicability of *Reynolds*.

To support this proposition, the Keiths cite the *Reynolds* trial court order granting summary judgment. Although the trial court in *Reynolds* explicitly relied on this reasoning to justify granting summary judgment in favor of Hess, the Supreme Court of Mississippi did not propound this rationale. Indeed, when reaching its legal conclusions, the *Reynolds* court did not once refer to the trial court's reasoning. Nor did the *Reynolds* court state that its decision turned on whether the operator was also the mineral lessee. Instead, the *Reynolds* court highlighted guiding law from other jurisdictions. *Reynolds*, 778 So. 2d at 762–63.

A close look at the facts of *Reynolds* reveals why the distinction the Keiths draw is not determinative. The *Reynolds* court held in favor of the operator, Hess, even though the operator was explicitly bound by and had signed the surface lease. In other words, Hess was able to rely on the implied and explicit surface rights granted to the mineral lessee in order to avoid its contractual obligations under the surface lease.[5] As the *Reynolds* trial court recognized, "[a]s Operator . . . Trans-State Oil Company *was acting on behalf of Humble* . . . to develop and operate the Unit for production of oil, gas, and water produc[tion]." *See also Reynolds*, 778 So. 2d at 760 ("The trial court found that as operator under the agreements Trans-State [Hess] had authority from Humble to use the surface in the lands leased by Humble for the economical development, operation, and production of the fieldwide unit under the same rights and powers . . . Humble had received under the 1940 lease."). For these reasons, *Reynolds* counsels in favor of Petro Harvester.

---

[5] Alternatively, the *Reynolds* court could have held that Hess was incapable of legally altering the scope of Humble's mineral rights. Even if that were the case, Hess would still be bound by *its own* surface lease with Reynolds.

No. 19-60151

**ii.**

The Keiths rely on several other cases that they contend support their position. But these authorities are inapposite. In *Colburn v. Parker & Parsley Development Co.*, 842 P.2d 321 (Kan. Ct. App. 1992), the issue was whether an oil and gas lessee could bargain away its explicit right to drill a salt water disposal well on the surface of the leased property and dispose of the salt water refuse without payment to the landowner. *Id.* at 323–25. The oil and gas lessee, Rupe, entered into a salt water disposal agreement with the landowner, the Colburns.[6] *Id.* at 327. Citing this agreement, Rupe sought to expand its implicit and explicit right to dispose of salt water resulting from its *own* operations to include a right to dispose of salt water produced as a result of *offsite* operations, in exchange for paying the Colburn's 1.5 cents per barrel of salt water disposed on the property. *Id.* Rupe's successor-in-interest argued that it was not required to pay the disposal fee for salt water originating on its property because the oil and gas lease gave it the right to build structures as necessary for the "economical operation" of the land. *Id.* at 324, 329. The Kansas Court of Appeals held in favor of the Colburns because the trial court's interpretation of the salt water disposal agreement was supported by substantial evidence. *Id.* at 331. The court held that "[a]lthough the lessee under an oil and gas lease has the implied right to dispose of salt water on the leased premises without payment to the lessor, that right may be bargained away by agreement between the parties." *Id.*

*Colburn* is distinguishable because the property owner in *Colburn* owned a fee simple interest in the property—the mineral rights had not been severed. *Id.* at 323. The *Colburn* court was not analyzing dueling or co-existent leases,

---

[6] In contrast to the facts in this case, the Colburns owned the land in fee simple and the estate was not severed. *Colburn*, 842 P.2d at 327.

as in *Reynolds* and the present case. Instead, the *Colburn* court was interpreting a *single* contract that it held governed instead of implicit salt water disposal rights granted to Kansas mineral lessees. The court did not reach the question of whether a surface lease or any other type of agreement supersedes rights given in a mineral lease. *Colburn* is also distinguishable because the mineral lease contained *no explicit right* to dispose of salt water on the property. Instead, "[t]his right arises by the reasonable application of implied covenants to oil and gas leases." *Id.* at 325–27 ("We hold the granting clause in an oil and gas lease includes an *implied* covenant to dispose of the salt water produced during operations by utilizing a salt water disposal well drilled on the leased premises without additional compensation to the lessor." (emphasis added)). By contrast, the right the Keiths seek to supersede through the Surface Lease is both explicitly stated in the Mineral Lease and enshrined in Mississippi common law. For these reasons, *Colburn* does not provide persuasive support for the Keiths' argument.

The Keiths also contend that the *Reynolds* court's effort to distinguish *Colburn* reveals that *Reynolds* turned on the fact that the mineral lessee had not signed the at-issue surface lease. The Keiths rely on the following passage from the *Reynolds* decision to support their argument:

> Although *Colburn* is somewhat closer to the mark than *Monfort*, it, too, is of limited applicability. First, it does not involve concurrent surface and mineral leases and does not address whether one may entirely supersede the other. Second, *Colburn* is factually distinguishable from the case at bar because in *Colburn* the mineral lessor and lessee were the same parties who executed the saltwater disposal agreement. A different situation exists in the present case in which Trans-State (Hess) and the Reynolds executed the 1968 surface lease, but neither was a party to the original 1940 mineral lease.

*Reynolds*, 778 So. 2d at 763.

As this passage shows, the *Reynolds* court primarily distinguished

*Colburn* by pointing to the fact that *Colburn* did not involve "concurrent surface and mineral leases" because the property in question had not been severed. *Id*. Moreover, the *Reynolds* court cited to three other cases to support its reasoning. *Id*. at 762–63 (discussing *Mingo Oil Producers*, 776 P.2d at 740; *Livingston*, 91 F.2d at 834–35; *Ball*, 602 S.W.2d at 523). In each of these cases, the mineral lessee and the operator were the same party, as in the present case.

For these reasons, neither *Colburn* nor the *Reynolds* court's discussion of it are persuasive that Petro Harvester's role as both operator *and* mineral lessee is determinative to distinguish the Mississippi Supreme Court's holding that a surface lease does not supersede a preexisting mineral lease.

Beyond *Colburn*, the Keiths point to one other case they contend suggests that *Reynolds* is inapplicable—*Mobil Oil Corp. v. Brennan*, 385 F.2d 951 (5th Cir. 1967). There, a dispute arose between a surface owner and a mineral owner on a severed piece of land. *Id*. at 952. The 1926 deed under which the mineral owner took ownership stated that "all pipe lines laid across any of said land . . . shall be placed below plow depth" and that the mineral owner could not "interfere with the use of lands for grazing purposes." *Id*. It was this deed that initially severed the mineral rights. *Id*. The surface owner eventually brought suit against the mineral owner seeking an injunction that would require the mineral owner to comply with the terms of the 1926 deed. *Id*. at 953. The mineral owner responded by pointing to a 1959 deed conveying the surface estate to the original surface owner's successor-in-interest. *Id*. at 952. The mineral owner argued that the 1959 deed expanded the mineral owner's surface rights as articulated in the 1926 deed because the 1959 deed did not expressly mention the surface use limitations contained in the 1926 deed. *Id*.

The legal issue was whether the covenants expressed in the 1926 deed

attached to the surface estate or the mineral estate. *Id.* at 953. If the covenants attached to the surface estate, the covenants were enforceable by the surface owner and did not need to be mentioned in the 1959 deed. If the covenants attached to the mineral estate, the covenants could only be enforced by the mineral owner. This court affirmed the district court's holding that the covenants in the 1926 deed "attached to the surface estate, and will remain with the same forever unless expressly detached therefrom by the surface owner." *Id.* at 953–54.

After resolving this issue—and determining that the surface owner could enforce the covenants in the 1926 deed against the mineral owner—this court considered the mineral owner's argument that, as a mineral owner, it had the "right to build the [concrete] foundations in order to explore for, develop, and produce minerals and that under Texas law the party in charge of drilling operations has no implied duty to restore the surface to the condition it was in prior to the commencement of the work." *Id.* at 954–55. This court rejected the argument, pointing out that "the real question is whether covenants in the 1926 deed expressly require [the mineral owner] to remove objects no longer needed for drilling operations." *Id.* at 955. In other words, this court was construing the deed. This court clarified that, under Texas law, "[e]xpress language may limit the surface easement of the mineral estate and impose upon the mineral owner a duty of restoration not otherwise present." *Id.* The Keiths rely on this quote for the proposition that "the surface owner was entitled to enforce limitations on the mineral owner's surface rights."

*Mobil Oil Corp.* is inapposite. The court in *Mobil Oil Corp.* was construing a mineral *deed*, whereas here the question, as in *Reynolds*, is the effect that a surface lease has on a mineral lease. Although the Keiths claim this difference does not matter, Mississippi courts have held that a property owner's rights can be curtailed through a deed. *See Singer v. Tatum*, 171 So.

2d 134, 149 (Miss. 1965) (noting that an owner "cannot claim any greater title than they received" under their deed); *see also Chevron U.S.A. v. State*, 578 So. 2d 644, 654 (Miss. 1991) ("[A]n oil and gas lease is a 'deed' as such term is usually employed. . . . The grantor of an oil and gas lease could write his conveyance so that his grantee acquired no title except upon production, a rule of capture, if you will, and if he did so we would be obligated to enforce it." (internal quotation marks and citations omitted)).

The Keiths also rely on dicta that appears in *EOG Resources, Inc. v. Turner*, 908 So. 2d 848, 854 (Miss. Ct. App. 2005). There, the Mississippi Court of Appeals stated that "a mineral owner or a lessee of the mineral estate, in the absence of additional rights expressly conveyed or reserved, may use as much of the surface as is reasonably necessary to exercise its right to recover minerals, without liability for surface damage." *Id.* In the same paragraph, the court noted that these implied surface rights "enure[] to the mineral estate in the absence of surface leases or other agreements expressly granting the mineral owner rights to use the surface of the land." *Id.* (citing *Reynolds*, 778 So. 2d at 762). The court later stated, however, that "[s]urface leases, surface damage agreements, or other contractual arrangements favoring the mineral estate merely expand the mineral owner's extant right to use as much of the surface as is reasonably necessary to conduct its operations." *Id.* (citing *Reynolds*, 778 So. 2d at 762). Whereas, the Keiths cite *EOG Resources* for the proposition that a mineral lessee can "alienate, limit, or restrict its implied rights to use the surface lands" through contracts, *EOG Resources* also did not involve any conflict between the mineral lessee's implied surface rights and a surface lease.

### iii.

We emphasize that our holding should not be construed to preclude the

No. 19-60151

possibility that a surface owner who also owns the mineral rights could include surface-use restrictions in the mineral lease.  Indeed, an appropriately drafted surface lease that refers explicitly to the mineral lease may be capable of modifying the mineral lease; and a mineral deed that initially severs the surface from the mineral rights might also establish surface-use restrictions. But no such language is presented here, so the question is academic, and we need not address the issue.

### iv.

For the foregoing reasons, we AFFIRM the district court's decision granting summary judgment in favor of Petro Harvester.

### B.

At summary judgment, the district court rejected each of the Keiths' affirmative defenses: waiver, ratification, and estoppel. The Keiths appeal the district court's rejection of each of these affirmative defenses. The Keiths bear the burden of proving each element of each affirmative defense by a preponderance of the evidence. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); FED. R. CIV. P. 56(c).

### i.

The district court rejected the Keiths' affirmative defense of waiver. The Keiths contend that Petro Harvester waived its right to use the surface of the subject property beyond the term of the Surface Lease because it was aware of its implied surface rights under *Reynolds* but still agreed to comply with all terms of the Surface Lease, complied with all of those terms, and then refused to comply with Section 8. Petro Harvester responds by distinguishing the sole case cited by the Keiths on appeal.

No. 19-60151

"[W]aiver is the intentional relinquishment or abandonment of a known right." *Rolison v. Fryar*, 204 So. 3d 725, 733 (Miss. 2016) (internal quotation marks and citation omitted). First, as explained above, Petro Harvester did not supersede or waive its implicit and explicit rights as a mineral lessee when it signed the Surface Lease. Second, the authority cited by the Keiths is not supportive of their position. To support their waiver theory, the Keiths point to a 1925 case applying Louisiana law, *Transcontinental Oil Co. v. Spencer*, 6 F.2d 866 (5th Cir. 1925). There, the dispute arose between a mineral lessor and a mineral lessee. *Id.* at 868. The mineral lease granted the lessor an option to terminate the lease if the lessee ceased oil and gas production on the land. *Id.* at 868. The lessee briefly ceased oil and gas production after concluding (wrongly) that the land was barren. *Id.* at 869. Soon after ceasing production, the lessee discovered additional oil and gas on the property and extraction levels spiked. *Id.* The lessor responded by seeking to exercise its option to terminate the lease based on the lessee's earlier production cessation. *Id.* This court held that the lessor waived its option to terminate the lease, noting that "[a] lessor is not entitled to occupy the inconsistent position of acquiescing in the lessee going on under the lease, and at the same time retaining the right to rescind for a known breach of a condition by the lessee." *Id.* ("[B]y consenting, with knowledge of a default, to the continued existence of the lease, [the lessor] waived the right to have it annulled.").

There are meaningful differences between *Transcontinental Oil Co.* and this case. *Transcontinental Oil Co.* involved a dispute between a mineral lessee and mineral lessor, but the dispute here is between a mineral lessee and surface owner. Moreover, unlike the lease in *Transcontinental Oil Co.*, the Surface Lease contains no termination clause, meaning that Petro Harvester had no choice but to comply with its terms and make lease payments to the Keiths while the Surface Lease was in effect. The district court correctly

16

rejected the Keiths' waiver affirmative defense.

### ii.

The district court rejected the Keiths' affirmative defense of ratification. The Keiths argue that Petro Harvester ratified the Surface Lease by complying with it from 2010 to 2018, thereby recognizing that it was bound by each of its terms.

"Ratification is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him." *Estate of St. Martin v. Hixson*, 145 So. 3d 1124, 1131 (Miss. 2014) (citation omitted). "[A] person ratifies an act by (a) manifesting assent that the act shall affect that person's legal relations, or (b) conduct that justifies a reasonable assumption that the person so consents." *Northlake Dev. LLC v. BankPlus*, 60 So. 3d 792, 797 (Miss. 2011) (alteration omitted).

There is no dispute that the Surface Lease was enforceable, valid, and ratified by Petro Harvester. But ratification is irrelevant. It is of no consequence whether Petro Harvester ratified the terms of the Surface Lease because Petro Harvester does not seek to nullify those terms. Instead, Petro Harvester seeks a declaratory judgment that it need not comply with the Keiths' interpretation of Section 8 because that interpretation is inconsistent with the mineral lease as well as Petro Harvester's implicit rights as a mineral lessee. The district court correctly rejected the Keiths' ratification affirmative defense.

### iii.

The district court rejected the Keiths' affirmative defense of estoppel. The Keiths argue that Petro Harvester should be estopped from reaping the

benefits of the Surface Lease while evading its obligations.

"Equitable estoppel is an extraordinary remedy to be used with caution." *Olshan Found. Repair Co. of Jackson, LLC v. Moore*, 251 So. 3d 725, 730 (Miss. 2018) (internal quotation marks and citation omitted). The doctrine "is generally defined as the principle by which a party is precluded from denying any material fact, induced by his words or conduct upon which a person relied, whereby the person changed his position in such a way that injury would be suffered if such denial or contrary assertion was allowed." *Brown v. McKee*, 242 So. 3d 121, 130 (Miss. 2018) (internal quotation marks and citation omitted). A party cannot be estopped from challenging the "legal effect of a contract." *St. Paul Fire & Marine Ins. Co. v. Vest Transp. Co.*, 500 F. Supp. 1365, 1379–80 (N.D. Miss. 1980). "In order for a representation to be the basis of an estoppel it must amount to a representation of material facts as opposed to a representation made as to a matter of law." *Barnett v. Getty Oil Co.*, 266 So. 2d 581, 587 (Miss. 1972).

Estoppel does not apply "where both parties [are] equally in possession of all the facts pertaining to the matter relied on as an estoppel, and the position taken thereto involved solely a question of law." *Miss. Power & Light Co. v. Pitts*, 179 So. 363, 365 (Miss. 1938); *Barnett*, 266 So. 2d at 587 (refusing to apply the doctrine of estoppel to the construction of a mineral lease). Whether Section 8 of the Surface Lease is applicable in light of the Mineral Lease is "solely a question of law." Therefore, even if Petro Harvester represented that it would comply with the Keiths' interpretation of Section 8, and even if the Keiths relied to their detriment on this representation, the doctrine of estoppel is inapplicable here. The district court correctly rejected the Keiths' estoppel affirmative defense.

No. 19-60151

## C.

The district court rejected the Keiths' argument that Petro Harvester's declaratory judgment action is barred by Mississippi's statute of limitations. The Keiths rely on a Mississippi case holding that challenges to the enforceability or reasonableness of contractual provisions must be brought within three years of the moment the party is put on notice about the objectionable provisions. *See CitiFinancial Mortg. Co., v. Washington*, 967 So. 2d 16, 19 (Miss. 2007). Petro Harvester responds that its declaratory judgment action relates to an underlying breach of contract action and that, therefore, the action did not accrue until the time of the alleged breach in March 2018.

Mississippi statutes do not identify a statute of limitations period for declaratory judgment actions. Instead, "[a]s a general rule, an action for declaratory judgment will be barred to the same extent that the applicable statute of limitations bars an underlying action in law or equity." *Gulf Shore Props., LLC v. City of Waveland*, No. 1:16cv437-HSO-JCG, 2018 WL 564942, at *4 (S.D. Miss. Jan. 25, 2018) (citing 22A Am. Jur. 2d Declaratory Judgments § 182 (2017)). "Because claims for declaratory relief necessarily derive from claims for substantive relief, the statute of limitations for the underlying action at law generally is applied to an accompanying action for declaratory relief." *Id.* (citing 22A Am. Jur. 2d Declaratory Judgments § 182 (2017)).

The question, therefore, is what cause of action underlies Petro Harvester's declaratory judgment action. Petro Harvester seeks a declaration that it is entitled to reasonably use the surface of the Keiths' property as a mineral lessee without interference from the Keiths. The Keiths counterclaimed, alleging breach of contract. Therefore, the underlying action can reasonably be classified as a breach of contract claim.

Under Miss. Code Ann. § 15-1-49(1), breach of contract actions are subject to a three-year statute of limitations. *Levens v. Campbell*, 733 So. 2d

No. 19-60151

753, 758 (Miss. 1999). Breach of contract actions accrue at the time of the alleged breach. *E.g.*, *Johnson v. Crisler*, 125 So. 724, 724–25 (Miss. 1930). The Keiths allege that Petro Harvester's breach began when the Surface Lease expired in March 2018. Therefore, Petro Harvester had until March 2021 to file its declaratory judgment action. Petro Harvester filed in March 2018, well within the statute of limitations.[7]

For these reasons, Petro Harvester's declaratory judgment action is not barred by Mississippi's statute of limitations.

## D.

The district court found that "[t]here are no disputed facts in this case. It presents a pure legal question." The Keiths contend that "genuine issues of material fact preclude . . . summary judgment." Petro Harvester responds that the Keiths did not identify any genuine issues of material fact to the district court and that the parties' cross-motions for summary judgment belie the

---

[7] Petro Harvester's declaratory judgment action is not time-barred under *CitiFinancial Mortg. Co., Inc. v. Washington*, 967 So. 2d 16, 19 (Miss. 2007), either. There, borrowers brought suit against a lender for breach of the covenant of good faith and fair dealing, among other claims. *Id.* at 18. The borrowers signed a loan agreement under which they received $31,480. *Id.* When they signed the agreement, the lender informed the borrowers that they would satisfy the debt after making 180 monthly payments of $400.57. *Id.* In reality, under the terms of the agreement, after 179 payments the borrowers would still owe $28,878.20. *Id.* The trial court rejected the lender's motion for summary judgment, and the lender appealed. *Id.* The Supreme Court of Mississippi held that the statute of limitations barred the borrowers' claims. *Id.* at 19. Because the borrowers were "on notice" about the terms of the loan (the very terms they challenged later) at the time the loan agreement was executed, the cause of action for breach of the covenant of good faith and fair dealing accrued upon execution of the agreement. *Id. CitiFinancial* is inapplicable here. The borrowers in *CitiFinancial* did not allege a breach of contract—they alleged that the very terms of the contract constituted a breach of the covenant of good faith and fair dealing. By contrast, here, Petro Harvester does not challenge the terms of the Surface Lease as unenforceable or against public policy or even as a breach of the covenant of good faith and fair dealing. Petro Harvester contends that it was not in breach of those terms, and seeks a declaratory judgment stating just that. Therefore, Petro Harvester had three years from the time the alleged breach occurred to bring suit.

No. 19-60151

Keiths' assertion that material factual disputes exist.

In their summary judgment briefing before the district court, neither party contended that there were material factual disputes. The Keiths waived their argument that there are genuine issues of material fact when they failed to identify those factual disputes to the district court.[8] *Prince-Rivers v. Fed. Express Ground*, 731 F. App'x 298, 301 (5th Cir. 2018); *Stearman v. C.I.R.* 436 F.3d 533, 537 (5th Cir. 2006). Additionally, while cross-motions for summary judgment do not automatically indicate the absence of genuine issues of material fact, "cross-motions may be probative of the non-existence of a factual dispute when, as here, they demonstrate a basic agreement concerning what legal theories and material facts are dispositive." *Bricklayers Local 15 v. Stuart Plastering Co.*, 512 F.2d 1017, 1023 (5th Cir. 1975); *Schlytter v. Baker*, 580 F.2d 848, 850 (5th Cir. 1978).

## IV.

We AFFIRM the district court's order granting summary judgment in favor of Petro Harvester.

---

[8] The Keiths state that they "did not agree that Petro Laurel presented an accurate or complete version of undisputed facts" during summary judgment briefing. But the Keiths do not identify any portion of the record showing that they notified the district court of objections to Petro Harvester's factual assertions.